**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALBANY MEDICAL CENTER, *et al.,*

               Plaintiffs,

    v.

XAVIER BECERRA,
Secretary of Health and Human Services,

            Defendant.

Case No.: Not Yet Assigned

**<u>COMPLAINT EXHIBIT 1</u>**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Provider Reimbursement Review Board
7500 Security Blvd.
Mail Stop: B1-01-31
Baltimore, MD 21244
410-786-2671

**<u>Via Electronic Delivery</u>**

Gregory Etzel, Esq.
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Ste. 4000
Houston, TX 77002

RE:  ***Notice of Dismissal – Updated Rationale***
Morgan Lewis Standardized Amount CIRP Group Cases
Case Nos. 19-0212G, *et al.* (*see* **<u>Appendix A</u>** listing 119 group cases)

Dear Mr. Etzel:

The Provider Reimbursement Review Board ("Board") has reviewed the appeal requests filed by the Providers in the one hundred and nineteen (119) above-referenced common issue related party ("CIRP") group cases relating to the standardized amounts used in federal rates for the inpatient prospective payment system ("IPPS") during federal fiscal year ("FFY") 1984, the initial year of IPPS.  The Medicare Contractor has filed Jurisdictional Challenges in all of those group cases.  The Providers' Representative filed responses to these challenges.  As set forth below, the Board has determined that, consistent with 42 U.S.C. §§ 1395ww(d)(7) and 1395oo(g)(2) and 42 C.F.R. § 405.1840(b), it lacks substantive jurisdiction over the appealed issue and is therefore dismissing all one hundred and nineteen (119) CIRP group cases in their entirety.  This determination is consistent with its prior dismissal determinations in other cases involving the same issue where the Board found no *substantive* jurisdiction;[1] however, in response to the additional briefing on this issue by other parties, the Board's decision has been updated to clarify and confirm that the federal rates for FFY 1986 and subsequent FFYs used the FFY 1985 budget neutrality-adjusted federal rates.

In summary, the Board finds that it lacks substantive jurisdiction over the issue raised in these appeals because the standardized amounts used for IPPS rates for FFYs 1984 and FFY 1985 are each based on the budget neutrality adjustment made for that FFY and the 1984 and 1985 budget neutrality adjustments are presumably designed to be corrective of the initial base rate that was set *using 1981 data*.[2]  Therefore, the *final* FFY 1984 and 1985 standardized amounts are *inextricably*

---

[1] Prior Board dismissal determinations of the issue in the instant group appeals include but are not limited to: Board dec. dated Apr. 6, 2023 (lead Case No. 19-0233GC); Board dec. dated Dec. 14, 2023 (lead Case No. 23-0695GC); Board dec. dated Jan. 23, 2024 (lead Case No. 19-1094GC); Board dec. dated Jan. 24, 2024 (lead Case No. 23-1522GC); and Board dec. dated Jan. 31, 2024 (lead Case No. 19-0847GC).  These jurisdictional decisions are posted on the Board's website, by the relevant year and month, at https://www.cms.gov/medicare/regulations-guidance/provider-reimbursement-review-board/list-prrb-jurisdictional-decisions.

[2] The Board has included at **<u>Appendix B</u>** examples of other adjustments to the standardized amounts that have occurred outside of the FFY 1984 and 1985 budget neutrality adjustments.  These intervening adjustments for FFYs 1986 and

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 2

*intertwined* with those applicable budget neutrality adjustments.[3]  Indeed, the standardized amounts were too high for FFYs 1984 and 1985 and the budget neutrality adjustments applied to those years reduced the standardized amounts (reduced by factors of approximately 0.03 for FFY 1984 and 0.05 for FFY 1985) and, thus, these budget neutrality adjustments appear to have automatically accounted for any such alleged errors in setting the initial base rate (which again was based on 1981 data).[4]  Because the FFY 1985 budget neutrality-adjusted rate was used/flowed forward for determining FFY 1986 rates and the rates for subsequent FFYs and because 42 U.S.C. § 1395ww(d)(7) prohibits administrative or judicial review of the FFY 1984 and 1985 budget neutrality adjustments, the Board may not review the standardized amount used for the FFYs appealed as it relates to the common issue in these appeals.  In this regard, the Board again notes that the rates for FFY 1986 and subsequent years are based on the budget neutrality adjusted FFY 1985 rates.  Accordingly, the Providers may not simply pass through, or over, the budget neutrality adjustments for FFYs 1984 and 1985, *for purposes of future FFYs*,[5] because those adjustments are tied to an absolute *external* event (the Secretary's estimate, based on the best available data, of what would have been paid for those years if there were no IPPS) **and** were **fixed** (no greater *and* no less than what would have been paid had there been no IPPS).  To do otherwise, would impact the very integrity of IPPS.[6]

### **Background:**

Morgan, Lewis & Bockius LLP ("Providers' Representative") represents a number of providers in common issue related party ("CIRP") and optional groups which are challenging the IPPS standardized amount.  The Medicare Contractor filed five (5) Jurisdictional Challenges covering one hundred and nineteen (119) group cases.[7]  The Providers' Representative filed responses to these challenges.  The group issue statements, jurisdictional challenges, and responses thereto for all one hundred and nineteen (119) cases are materially identical and can be considered together.

The group issue statement presented is:

> Whether the Secretary's failure to distinguish between patient discharges and transfers during the implementation of the inpatient prospective payment system resulted in an understatement of the Federal DRG

---

2018 include both mandatory and discretionary revisions **to the standardized amounts** (as well as the Congress' decisions to revise or not revise the "applicable percentage increases" for FFYs 1986 and forward as provided in 42 U.S.C. § 1395ww(b)(3)(B)(i)) and highlight the complexity of the issue before the Board, particularly where such adjustments were made in a budget neutral manner or were based on factoring in certain other estimated impacts

[3] *See infra* note 55 (citing to decisions that discuss similar circumstances involving Medicare provisions found to be inextricably tied to certain other provisions for which Congress precluded administrative and judicial review).

[4] *See infra* 39 note  (discussing how the removal of nurse anesthetists costs were removed from IPPS and how that removal was *automatically* accounted for as part of the 1985 budget neutrality adjustment).

[5] *See also supra* note 2 outlining additional intervening adjustments that could be adversely impacted by the relief being sought by the Providers, thereby raising other similar IPPS integrity concerns.

[6] *See also supra* note 2 outlining additional intervening adjustments that could be adversely impacted by the relief being sought by the Providers, thereby raising other similar IPPS integrity concerns that could potentially serve as an alternative rationale.

[7] *See* **Appendix A**.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 3

Prospective Payment Amounts paid to the Providers in the fiscal year at issue.[8]

## Procedural Background:

### A. Appealed Issue

In the Providers' group issue statements, they explain that the IPPS requires the categorization of different types of discharges (diagnostic related groups, or "DRGs"), and payment rates applicable to each discharge category. Their appeals challenge the latter, arguing that the data used to establish the initial "flat rate" payable per discharge resulted in an understated payment rate. CMS opted to use 1981 as a "base year" to calculate these rates, and thus data was collected from hospitals' 1981 cost reports to determine average costs for each discharge category. The data was adjusted for inflation and standardized, but the Providers argue that the initial calculation of this standardized amount continues to serve as the base for all future calculations. Since the Providers allege this initial calculation was understated, they argue that the calculation for each subsequent year has also been understated.[9]

The Providers claim that the data sources used in collecting the 1981 data did not distinguish between patients who were discharged from the hospital, and patients who were transferred to another hospital or facility. They state that CMS views transfers as distinct from discharges, but in calculating the average cost per discharge using the 1981 data, CMS erroneously included transfers in the total number of discharges, thereby inflating the denominator of the cost to discharge ratio. They claim that CMS has acknowledged this error in at least one other context (*i.e.*, during the implementation of the capital PPS), and that this error was the reason for certain DRG weight recalibrations, but that CMS failed to fully correct the flawed Standardized Amount.[10]

In each case, the Providers are challenging the applicable FFY IPPS rates as set forth in the Federal Register.[11] They argue the appeals are not barred by the "predicate facts" provision of 42 C.F.R. § 405.1885(a)(1)(iii) and that there is no impediment to CMS correcting its erroneous data to remediate the flawed Standardized Amount. They claim that the average cost per discharge should not include transfers, that CMS has acknowledged this as well as the fact that certain Standardized Amounts erroneously included transfers. Finally, they argue that the understated Standardized Amounts and their resulting understated Medicare payments produces cost shifting prohibited by 42 U.S.C. § 1395x(v)(1)(A)(i).[12]

---

[8] *E.g.*, Case 19-0212G, Group Issue Statement at 1 (Nov. 2, 2018).
[9] *Id.*
[10] *E.g.*, PRRB Case No. 19-0212G, Providers' Preliminary Position Paper at 11-12 (citing 56 Fed. Reg. 43449, 43387 (Aug. 30, 1991) (related to capital PPS) and 60 Fed. Reg. 45791 (Sept. 1, 1995) (related to recalibration of DRG weights to exclude transfers for FY 1996)).
[11] *See id.* at 8 ("The Secretary's original calculation of the Standardized Amount in 1983 still directly impacts Medicare reimbursement under IPPS for the fiscal year at issue in this appeal.").
[12] *Id.* at 13-14.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 4

### B. Jurisdictional Challenges

The Medicare Contractor filed challenges in one hundred-nineteen (119) different group cases, and the Providers filed a response in each case.[13]  The Medicare Contractor argues that the merits of the appealed issue are illegitimate, but more importantly, that the Board lacks subject matter jurisdiction and need not even address the merits of the issue.  It references the Board's April 6, 2023 decision dismissing five (5) different CIRP group appeals concerning the same issue.  The Medicare Contractor argues the Board should apply the same rationale and find that 42 U.S.C. § 1395ww(d)(7)(A) precludes administrative review of the base year standardized amounts.  It also claims that budget neutrality adjustments after the base year amount was calculated have corrected any potential errors from prior years, and that the data shows the base year was, in fact, initially set too high (rather than understated).

The Providers' responses to these challenges reiterated that the group appeal rests on the fact that each appeal's IPPS payments for the applicable FFY are understated as "[t]he DRG Payment Amount formula for fiscal year 1986, and all years following it, still includes a calculation of the standardized amount with the same embedded Discharge Calculation error."[14]  The ask the Board to find it has jurisdiction over these appeals.

The Providers counter the Medicare Contractor by arguing that the plain language of 42 U.S.C. § 1395ww(d)(7)(A) "does not contain any limitation to the administrative or judicial review of the Secretary's determination of the standardized amount. . .[15]  The Providers claim they do not seek to challenge the FFY 1984 or 1985 IPPS payments, and the Providers' challenge is not "inextricably tied" with the budget neutrality adjustment subject to judicial preclusion.[16]  The Providers also argue that the Board was in error when it labeled the 1984-1985 budget neutrality adjustments as the "applicable percentage increase", as that term started with fiscal year 1986.[17]  They argue that there is a strong presumption in favor of judicial review, and that in this instance there is not clear indication that Congress intended to preclude review of more recent FFY Standardized Amounts or the predicate facts related to the methodology for calculating the 1983 Standardized Amount.[18]

### Board Decision:

As described more fully below, the Board finds that it lacks substantive jurisdiction over each of the 119 groups because:  (1) the initial IPPS standardized amounts set for FFY 1984[19] are ***inextricably*** tied to the FFY 1984 and 1985 budget neutrality adjustments to the "applicable

---

[13] *See* **Appendix A** for a complete list of challenges and cases impacted.  As previously noted, the challenges are all materially identical.

[14] *E.g.*, PRRB Case No. 19-0212G, Providers' Response to MAC Jurisdictional Challenge at 4 (Feb. 10, 2024).

[15] *Id.* at 6.

[16] *Id.* at 8.

[17] *Id.* at 16.

[18] *Id.* at 22.

[19] The Board notes that, initially, there was not just one standardized amount.  Rather there were 20 average standard amounts per discharge according to urban/rural designation in each of the nine census divisions and the nation and each of these 20 rates is further divided into a labor and nonlabor portion.  *See* 48 Fed. Reg. 39752, 39763 (Sept. 1, 1983).

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 5

percentage increases" for IPPS[20]; (2) the FFY 1985 budget neutrality-adjusted rates were used to determine the rates for FFY 1986 and, thus, became embedded into the rates determined for subsequent FFYs; and (3) 42 U.S.C. § 1395ww(d)(7) prohibits administrative or judicial review of the FFY 1984 and 1985 budget neutrality adjustments.  Further, the fact that the Secretary's budget neutrality adjustment to the FY 1984 Federal Rates was 0.970[21] demonstrates that, contrary to the Providers' assertions, the initial standardized amount was ***not*** understated but rather was *overstated* by a factor of 0.030 (*i.e.*, 1.000 – 0.970).

### A. Statutory Background on IPPS and the Standardized Amount Used in IPPS Rates

Part A of the Medicare program covers "inpatient hospital services." Since October 1, 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under the IPPS.[22]  Under IPPS, Medicare pays a prospectively-determined rate per eligible discharge, subject to certain payment adjustments.[23]

In order to implement IPPS, "the statute require[d] that the Secretary determine national and regional adjusted DRG prospective payment rates for each DRG to cover the operating costs of inpatient hospital services."[24]  The methodology for arriving at the appropriate rate structure is located at 42 U.S.C. § 1395ww(d)(2) and "requires that certain ***base period*** cost data be developed and modified in several specified ways (*i.e.*, inflated, standardized, grouped, and adjusted) resulting in 20 average standard amounts per discharge according to urban/rural designation in each of the nine census divisions and the nation."[25]  Section 1395ww(d)(2)(A) requires that the Secretary determine a "base period" operating cost per discharge using the most recent cost reporting period for which data are available:

> (II)  DETERMINING ALLOWABLE INDIVIDUAL HOSPITAL COSTS FOR BASE PERIOD.—The Secretary shall determine the allowable operating costs per discharge of inpatient hospital services for the hospital for the most recent cost reporting period for which data are available.

Consistent with these statutory provisions, the Secretary used Medicare hospital cost reports for reporting periods ending in 1981 and set the 1984 "base period" operating cost per discharge amount using the 1981 operating costs per discharge amount *updated* by an inflationary factor.[26]

---

[20] 42 U.S.C. § 1395ww(e) is entitled "Proportional adjustments in applicable percentage increases."  The 1984 and 1985 budget neutrality adjustments are set forth is § 1395ww(e)(1)(B) which is cross-referenced for 1984 IPPS rates at § 1395ww(d)(2)(F) and for 1985 IPPS rates at § 1395ww(d)(3)(C).

[21] In the final rule published on January 3, 1984, the Secretary revised the Federal budget neutrality adjustment factor to 0.970. 49 Fed. Reg. 234, 334 (Jan. 3, 1984).

[22] *See* 42 U.S.C. § 1395ww(d)(l)-(5); 42 C.F.R. Part 412.

[23]  *Id.*

[24] 48 Fed. Reg. 39752, 39763 (Sept. 1, 1983).

[25] *Id.* (emphasis added).

[26] *Id*. at 39763-64.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 6

The Providers dispute how the Secretary determined "discharges" and allege that the Secretary improperly treated transfers as discharges for purposes of this calculation.

The Secretary then "standardized" the FFY 1984 base period operating cost per discharge using the process prescribed at 42 U.S.C. § 1395ww(d)(2)(c).  The standardization process removed the effects of certain variable costs from the cost data, including (but not limited to) excluding costs associated with indirect medical education costs, adjusting for variations in average hospital wage levels, and adjusting for variations in case mix among hospitals.

The initial standardized amounts have been annually adjusted and/or updated.  However, contrary to the characterization in the D.C. Circuit's 2011 decision in *Saint Francis Med. Ctr. v. Azar* ("*Saint Francis*"), the standardized amount is not adjusted each year simply for inflation.[27]  Significantly, some of these annual adjustments were required to be *budget neutral* and are not subject to administrative review and others are discretionary.  In particular, 42 U.S.C. § 1395ww(e)(1)(B) provides the budget neutrality adjustment for "the applicable percentage increases" to the standardized amounts for 1984 and 1985 and states, in pertinent part:

> **(e) Proportional adjustments in _applicable percentage increases_**
>
> (1) . . . .
>
> (B) For discharges occurring in fiscal year 1984 or fiscal year 1985, the Secretary shall provide under subsections (d)(2)(F) and (d)(3)(C) for such equal proportional adjustment *in each of the average standardized amounts* otherwise computed for that fiscal year as may be necessary to assure that—
>
>> (i) the aggregate payment amounts otherwise provided under subsection (d)(1)(A)(i)(II) and (d)(5) for that fiscal year for operating costs of inpatient hospital services of hospitals (excluding payments made under section 1395cc(a)(1)(F) of this title),
>
>> *are not greater or less than*—
>
>> (ii) the DRG percentage (as defined in subsection (d)(1)(C)) of *the payment amounts which would have been payable for such services* for those same hospitals for that fiscal year under this section *under the law as in effect before April 20, 1983* (excluding payments made under section 1395cc(a)(1)(F) of this title).[28]

---

[27] 894 F.3d 290, 291 (D.C. Cir. 2011).  *Saint Francis* did not analyze how the standardized amount is updated annually nor did it make specific legal holdings regarding the standardized amount.
[28] (Bold emphasis in original and italics and underline emphasis added.)  The budget neutrality adjustment at 42 U.S.C. § 1395ww(e)(1)(B) is cross-referenced for 1984 at 1395ww(d)(2)(F) and for 1985 at § 1395ww(d)(3)(C).

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 7

The Secretary implemented the above budget neutrality provisions at 42 C.F.R. §§ 412.62(i) and 412.63(v) for the 1984 rate year and 1985 rate year respectively.  Specifically, § 412.62(i) provides the following instruction for maintaining budget neutrality for the 1984 Federal IPPS rates:

> (i) *Maintaining budget neutrality.* (1) CMS adjusts each of the **reduced standardized amounts** determined under paragraphs (c) through (h) of this section as required for fiscal year 1984 so that the estimated amount of aggregate payments made, excluding the hospital-specific portion (that is, the total of the Federal portion of transition payments, plus any adjustments and special treatment of certain classes of hospitals for Federal fiscal year 1984) **is not greater or less than** 25 percent of **the payment amounts that would have been payable** for the inpatient operating costs for those same hospitals for fiscal year 1984 **under the Social Security Act as in effect on April 19, 1983**.
>
> (2) The aggregate payments considered under this paragraph exclude payments for per case review by a utilization and quality control quality improvement organization, as allowed under section 1866(a)(1)(F) of the Act.[29]

Similarly, the regulation at 42 C.F.R. § 412.63(v) provides the following instruction for maintaining budget neutrality for the 1985 Federal rates for IPPS:

> (v) *Maintaining budget neutrality for fiscal year 1985.* (1) For fiscal year 1985, CMS will adjust each of the reduced standardized amounts determined under paragraph (c) of this section as required for fiscal year 1985 to ensure that the estimated amount of aggregate payments made, excluding the hospital-specific portion (that is, the total of the Federal portion of transition payments, plus any adjustments and special treatment of certain classes of hospitals for fiscal year 1985) is **not greater or less** than 50 percent of the **payment amounts that would have been payable** for the inpatient operating costs for those same hospitals for fiscal year 1985 **under the law as in effect on April 19, 1983**.
>
> (2) The aggregate payments considered under this paragraph exclude payments for per case review by a utilization and quality control quality improvement organization, as allowed under section 1866(a)(1)(F) of the Act.[30]

---

[29] (Italics emphasis in original and bold and underline emphasis added.)
[30] (Italics emphasis in original and bold and underline emphasis added.)

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 8

Essentially, Congress mandated that the Secretary/CMS adjust the standardized amounts for both 1984 and 1985 to ensure that the estimated amount of aggregate payments made under IPPS was not *greater than* **or** *less than* what would have been payable for inpatient operating costs for the same hospitals under the prior reimbursement system (*i.e.*, reasonable costs subject to TEFRA limits).  In other words, pursuant to budget neutrality, the size of the pie, expressed as average payment per case, is prescribed by law to be *no more* **and** *no less* than what would have been paid had IPPS not been implemented.  Significantly, the reference points for maintaining budget neutrality for 1984 and 1985 are **_external_** to IPPS and, thus, **_fixed_** (no greater *and* no less) based on the best data available.[31]  Since these points are **_fixed,_** it also means that it is capped (*i.e.*, cannot be increased subsequently outside of the budget neutrality adjustment).

This conclusion is supported by the fact that the normal annual inflation adjustments to the standardized amount provided for in IPPS apply only for FY 1986 forward, as set forth in 42 U.S.C. § 1395ww(b)(3)(B)(3)(i) and cross referenced in § 1395ww(d)(3)(A).  Specifically, 42 U.S.C.  § 1395ww(b)(3)(B)(i) (2018) defines the term "applicable percentage increase" starting with fiscal year 1986 (as opposed to 1984):

> (B)(i) For purposes of subsection (d) and subsection (j) for discharges occurring during a fiscal year, the "applicable percentage increase" shall be—
>
> (I) **_for fiscal year 1986_**, 1⁄2 percent,
>
> (II) for fiscal year **1987**, 1.15 percent,
>
> (III) for fiscal year **1988**, 3.0 percent for hospitals located in a rural area, 1.5 percent for hospitals located in a large urban area (as

---

[31] 48 Fed. Reg. 39752, 39887 (Sept. 1, 1983) provides the following discussion supporting the Board's pie concept:
> Section 1886(e)(1) of the Act requires that, for Federal fiscal years 1984 and 1985, prospective payments be adjusted so that aggregate payments for the operating costs of inpatient hospital services are neither more nor less than we estimate would have been paid under prior legislation for the costs of the same services.  To implement this provision, we are making actuarially determined adjustments to the average standardized amounts used to determine Federal national and regional payment rates and to the updating factors used to determine the hospital-specific per case amounts incorporated in the blended transition payment rates for fiscal years 1984 and 1985.  Section 1886(d)(6) of the Act requires that the annual published notice of the methodology, data and rates include an explanation of any budget neutrality adjustments. This section is intended to fulfill that requirement.
> Although, for methodological reasons, the budget neutrality adjustment is calculated on a per discharge basis, it should be emphasized that the ultimate comparison is between the aggregate payments to be made under the prospective payment system and the aggregate payments that would have been incurred under the prior legislation.  Therefore, changes in hospital behavior from that which would have occurred in the absence of the prospective payment system are required to be taken into account in determining the budget neutrality adjustment if they affect aggregate payment. For example, any expectation of increased admissions beyond the level that would have occurred under prior law would have to be considered in the adjustment. To assist in making the budget neutrality adjustment for, and take account of, fiscal year 1985, HCFA will monitor for changes in hospital behavior attributable to the new system.

defined in subsection (d)(2)(D)), and 1.0 percent for hospitals located in other urban areas,

(IV) for fiscal year *1989*, the market basket percentage increase minus 1.5 percentage points for hospitals located in a rural area, the market basket percentage increase minus 2.0 percentage points for hospitals located in a large urban area, and the market basket percentage increase minus 2.5 percentage points for hospitals located in other urban areas,

(V) for fiscal year *1990*, the market basket percentage increase plus 4.22 percentage points for hospitals located in a rural area, the market basket percentage increase plus 0.12 percentage points for hospitals located in a large urban area, and the market basket percentage increase minus 0.53 percentage points for hospitals located in other urban areas,

(VI) for fiscal year *1991*, the market basket percentage increase minus 2.0 percentage points for hospitals in a large or other urban area, and the market basket percentage increase minus 0.7 percentage point for hospitals located in a rural area,

(VII) for fiscal year *1992*, the market basket percentage increase minus 1.6 percentage points for hospitals in a large urban or other urban area, and the market basket percentage increase minus 0.6 percentage point for hospitals located in a rural area,

(VIII) for fiscal year *1993*, the market basket percentage increase minus 1.55 percentage point for hospitals in a large urban or other urban area, and the market basket percentage increase minus 0.55 1 for hospitals located in a rural area,

(IX) for fiscal year *1994*, the market basket percentage increase minus 2.5 percentage points for hospitals located in a large urban or other urban area, and the market basket percentage increase minus 1.0 percentage point for hospitals located in a rural area,

(X) for fiscal year *1995*, the market basket percentage increase minus 2.5 percentage points for hospitals located in a large urban or other urban area, and such percentage increase for hospitals located in a rural area as will provide for the average standardized amount determined under subsection (d)(3)(A) for hospitals located in a rural area being equal to such average standardized amount for hospitals located in an urban area (other than a large urban area),

(XI) for fiscal year *1996*, the market basket percentage increase minus 2.0 percentage points for hospitals in all areas,

(XII) for fiscal year *1997*, the market basket percentage increase minus 0.5 percentage point for hospitals in all areas,

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 10

(XIII) for fiscal year *1998*, 0 percent,

(XIV) for fiscal year *1999*, the market basket percentage increase minus 1.9 percentage points for hospitals in all areas,

(XV) for fiscal year *2000*, the market basket percentage increase minus 1.8 percentage points for hospitals in all areas,

(XVI) for fiscal year *2001*, the market basket percentage increase for hospitals in all areas,

(XVII) for fiscal year *2002*, the market basket percentage increase minus 0.55 percentage points for hospitals in all areas,

(XVIII) for fiscal year *2003*, the market basket percentage increase minus 0.55 percentage points for hospitals in all areas,

(XIX) for each of fiscal years *2004* through *2006*, subject to clause (vii), the market basket percentage increase for hospitals in all areas; and

(XX) ***for each subsequent fiscal year***, subject to clauses (viii), (ix), (xi), and (xii), the market basket percentage increase for hospitals in all areas.[32]

The "applicable percentage increase" as defined in § 1395ww(b)(3)(B) is incorporated into § 1395ww(d)(3)(A), as it relates to updating of the standardized amount:

**(B) UPDATING** PREVIOUS STANDARDIZED AMOUNTS.—(i) For discharges occurring in a fiscal year beginning ***before*** October 1, 1987, the Secretary shall compute an average standardized amount for hospitals located in an urban area and for hospitals located in a rural area within the United States and for hospitals located in an urban area and for hospitals located in a rural area within each region, ***equal to*** *the respective average standardized amount computed for the previous fiscal year under paragraph (2)(D) or under this subparagraph,* ***increased for the fiscal year involved by the applicable percentage increase under subsection (b)(3)(B)***. With respect to discharges occurring on or after October 1, 1987, the Secretary shall compute urban and rural averages on the basis of discharge weighting rather than hospital weighting, making appropriate adjustments to ensure that computation  on such basis does not result in total payments under this section that are greater or less than the total payments that would have been made under this section but for this sentence, and making appropriate changes in the manner of determining the reductions under subparagraph (C)(ii).

---

[32] (Emphasis added.)

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 11

(ii) For discharges occurring in a fiscal year beginning on or after October 1, 1987, and ending on or before September 30, 1994, the Secretary shall compute an average standardized amount for hospitals located in a large urban area, for hospitals located in a rural area, and for hospitals located in other urban areas, within the United States and within each region, equal to the respective average standardized amount computed for the previous fiscal year under this subparagraph increased by the applicable percentage increase under subsection (b)(3)(B)(i) with respect to hospitals located in the respective areas for the fiscal year involved.

(iii) For discharges occurring in the fiscal year beginning on October 1, 1994, the average standardized amount for hospitals located in a rural area shall be equal to the average standardized amount for hospitals located in an urban area. For discharges occurring on or after October 1, 1994, the Secretary shall adjust the ratio of the labor portion to non-labor portion of each average standardized amount to equal such ratio for the national average of all standardized amounts.

(iv)(I) Subject to subclause (II), for discharges occurring in a fiscal year beginning on or after October 1, 1995, the Secretary shall compute an average standardized amount for hospitals located in a large urban area and for hospitals located in other areas within the United States and within each region equal to the respective average standardized amount computed for the previous fiscal year under this subparagraph increased by the applicable percentage increase under subsection (b)(3)(B)(i) with respect to hospitals located in the respective areas for the fiscal year involved.

(II) For discharges occurring in a fiscal year (beginning with fiscal year 2004), the Secretary shall compute a standardized amount for hospitals located in any area within the United States and within each region equal to the standardized amount computed for the previous fiscal year under this subparagraph for hospitals located in a large urban area (or, beginning with fiscal year 2005, for all hospitals in the previous fiscal year) increased by the applicable percentage increase under subsection (b)(3)(B)(i) for the fiscal year involved.

Thus, while 42 U.S.C. § 1395ww(d)(2) provides the methodology for calculating the standardized amount to be used for each year, and that the amount is subject to the "applicable percentage increase" under subsection (b)(3)(B) *for years after 1984*, it remains that it is not always a simple inflationary or market basket adjustment. In particular, the FFY 1984 and 1985 budget neutrality adjustments (as referenced in § 1395ww(d)(2)(F) and in § 1395ww(d)(3)(C))

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 12

were the applicable percentage increases for FFYs 1984 and 1985 and, as described below, those adjustments are not administratively reviewable.  Further, as discussed *infra*, it is clear that the Secretary has interpreted 42 U.S.C. § 1395ww(d)(3)(A)(i) to require the FFY 1985 budget neutrality-adjusted rates be used in determining the rates for FFY 1986 and subsequent FFYs. This is reflected in the following excerpt from 42 C.F.R. § 405.473(c) as initially adopted in the September 3, 1983 final rule:

> (c)  *Federal rates for fiscal years after Federal fiscal year 1984.*
>
> ****
>
> (2) *Updating previous standardized amounts.*
>
> (i) *For fiscal year 1985.*  HCFA will compute an average standardized amount for each group of hospitals described in paragraph (b)(5) of this section . . . equal to the respective adjusted average standardized amount computed for fiscal year 1984 under paragraph (b)(7) of this section—
>
> (A) Increased for fiscal year 1985 by the applicable percentage increase under § 405.463(c);
>
> (B) Adjusted by the estimated amount of Medicare payment for nonphysician services furnished to hospital inpatients that would have been paid under Part B were it not for the fact that such services must be furnished either directly by hospitals or under arrangements;
>
> (C) Reduced by a proportion equal to the proportion (estimated by HCFA) of the total amount of prospective payments which are additional payment amounts attributable to outlier cases under § 405.475; and
>
> (D) **Adjusted for budget neutrality under paragraph (c)(4) of this section**.
>
> (ii) **For fiscal year 1986** and thereafter, **HCFA will compute an average standardized amount** for each group of hospitals described in paragraph (b)(5) of this section, **equal to the respective adjusted average standardized amounts computed for the previous fiscal year**—
>
> (A) Increased by the applicable percentage increase determined under paragraph (c)(3) of this section; and

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 13

(B) Adjusted by the estimated amount of Medicare payment for nonphysician services furnished to hospital inpatients that would have been paid under Part B were it not for the fact that such services must be furnished either directly by hospitals or under arrangements.

(C) Reduced by a proportion equal to the proportion (estimated by HCFA) of the amount of payments based on the total amount of prospective payments which are additional payment amounts attributable to outlier cases under § 405.475.

(3) *Determining applicable percentage changes for fiscal year 1986 and following*. The Secretary will determine for each fiscal year (beginning with fiscal year 1986) the applicable percentage change which will apply for purposes of paragraph (c)(2)(ii) of this section as the applicable percentage increase for discharges in that fiscal year, and which will take into account amounts the Secretary believes necessary for the efficient and effective delivery of medically appropriate and necessary care of high quality. In making this determination, the Secretary will consider the recommendations of the Prospective Payment Assessment Commission.[33]

---

[33] 48 Fed. Reg. at 39823 (italics emphasis in original and bold and underline emphasis added).  This provision was later moved to 42 C.F.R. § 412.63(c)(2022) which states in pertinent part:

(c) *Updating previous standardized amounts*.

****

(2) Each of those amounts is equal to the respective adjusted average standardized amount computed for fiscal year 1984 under §412.62(g)—

(i) Increased for fiscal year 1985 by the applicable percentage increase in the hospital market basket;

(ii) Adjusted by the estimated amount of Medicare payment for nonphysician services furnished to hospital inpatients that would have been paid under Part B were it not for the fact that such services must be furnished either directly by hospitals or under arrangements;

(iii) Reduced by a proportion equal to the proportion (estimated by CMS) of the total amount of prospective payments that are additional payment amounts attributable to outlier cases under subpart F of this part; and

(iv) **Adjusted for budget neutrality under paragraph (h) of this section**.

(3)  ***For fiscal year 1986*** *and thereafter*.  CMS computes, for urban and rural hospitals in the United States and for urban and rural hospitals in each region, average standardized amount equal to the respective **adjusted** **average standardized amounts computed for the previous fiscal year**—

(i) Increased by the applicable percentage increase determined under paragraphs (d) through (g) of this section;

(ii) Adjusted by the estimated amount of Medicare payment for nonphysician services furnished to hospital inpatients that would have been paid under Part B were it not for the fact that such services must be furnished either directly by hospitals or under arrangements; and

(iii) For discharges occurring on or after October 1, 1985 and before October 1, 1986, reduced by a proportion (estimated by HCFA) of the amount of payments based on the total amount of

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 14

## B.  Jurisdictional Findings -- 42 U.S.C. § 1395ww(d)(7)(A) Precludes Administrative Review of the Base Year Standardized Amounts

The Providers essentially are challenging the standardized amount used in the IPPS rates for several FFYs claiming that the Secretary improperly treated transfers as discharges when using 1981 cost report data to determine the initial FFY 1984 base cost per discharge which, in turn, was standardized to arrive at the FFY 1984 standardized amounts.  More specifically, the Providers maintain that, the understatement of the standardized amount in the FFY 1984 IPPS Final Rule caused a corresponding underpayment in IPPS payments in FFY 1984 __*and every FFY thereafter*__ *because the standardized amount for all IPPS payments for every FFY are based on CMS's calculation of the FFY 1984 standardized amount.*[34]

The published standardized amount for each FFY in these appeals reflects the prior year's standardized amount plus "the applicable percentage increase" as provided in 42 U.S.C. § 1395ww(b)(3)(B)(i) (as referenced in 42 U.S.C. § 1395ww(d)(3)(A)) as well *as other potential adjustments*.  Significantly, the "applicable percentage increase[s]" for 1984 forward are *not* always simply a cost inflation adjustment or other similar percentage adjustment.  To this point, for the first two (2) years of IPPS, Congress mandated that the budget neutrality adjustments for FFYs 1984 and 1985 serve as the "applicable percentage increase" for those years.  As a result, the IPPS rates that the Secretary used *for the very first year of IPPS* and then the second year of IPPS were adjusted for budget neutrality.  For FFYs 1986 and forward, Congress provided for an "applicable percentage increase" in 42 U.S.C. § 1395ww(b)(3)(B)(i) as referenced in 42 U.S.C. § 1395ww(d)(3)(A).  In addition, there are other *permanent* adjustments (*i.e.*, adjustments not for that year only but that also apply on a going-forward basis) to the standardized amount that have occurred in other years outside of the "applicable percentage increase."[35]  Thus, the standardized amount for a particular year is an amalgamation that builds upon the prior year's standardized amount and then adds additional adjustments for the current year.  As noted *supra* and discussed more *infra*,  the Secretary has used the FFY 1985 budget neutrality-adjusted rates for determining the FFY 1986 rates and those for subsequent FFYs.

The Providers are, essentially, seeking to peel back the amalgamated standardized amount for each applicable FFY *and, thus, reach back **more than 30 years** to increase the initial FFY 1984 base rate that was used to set the initial FFY 1984 standardized amount*s. They would then incorporate the alleged increased base rate into the FFY 1984 standardized amount*s* and then simply carry or flow that *increase forward 35 years*.  However, in order to peel the amalgamated standardized amounts for the FFYs at issue (singular[36]) *as used in the IPPS rates for each FFY* back to the

---

prospective payments that are additional payment amounts attributable to outlier cases under subpart F of this part, and for discharges occurring on or after October 1, 1986, reduced by a proportion (estimated by HCFA) of the amount of payments that, based on the total amount of prospective payments for urban hospitals and the total amount of prospective payments for rural hospitals, are additional payments attributable to outlier cases in such hospitals under subpart F of this part.

[34] *See e.g.*, PRRB Case No. 19-0212G, Providers' Response to MAC Jurisdictional Challenge at 21 (Feb. 10, 2024).
[35] *See* **Appendix B.**
[36] *See supra* note 19 accompanying text.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 15

initial standardized amount**s** (plural[37]) used in FFY 1984, and then carry/flow any change forward *to the FFY at issue*, the Providers would have to pass through the FFY 1984 and 1985 budget neutrality adjustments which were the only "applicable percentage increase[s]" for those years. However, they cannot do so because the budget neutrality adjustments had the effect of ***fixing*** the pie for FFYs 1984 and 1985 to (*i.e.*, no more ***and*** no less than) the aggregate amounts that would have been paid had IPPS not been implemented.[38]  More specifically, the amalgamated standardized payment amount for each FFY at issue reflects the *fixed* FFY 1985 budget neutrality adjustment (and not the initial FFY 1984 standardized amount since the standardized amounts for FFYs 1984 and 1985 were each adjusted for budget neutrality and became *fixed* for purposes of subsequent years as a result of those budget neutrality adjustments).  Thus, in the Board's view, the Providers cannot get back to the FFY 1984 standardized amounts without first passing through the FFY 1984 and 1985 budget neutrality adjustments.  Regardless, the Providers would not be able to flow forward any adjustments made to the FFY 1984 standardized amounts to FFYs after FFY 1985 because:

> (1) they, again, would not be able to get through the FFY 1984 and 1985 budget neutrality adjustments that Congress otherwise ***fixed*** to an external point (no greater and no less); and

> (2) the IPPS rates paid for FFYs 1984 and 1985 are based on standardized amounts that were adjusted downwards as a result of the budget neutrality adjustment for FFY 1984 and also for FFY 1985 (*see* discussion below in Sections B.1 and B.2).[39]

---

[37] *See id.*

[38] *See, e.g.,* 48 Fed. Reg. 39752, 39805 (Sept. 1, 1983) (stating: "Hospital Impact—During its first two years, aggregate payments under the prospective payment system will be adjusted, in accordance with Section 1886(e)(1) of the Act, to be "budget neutral"; that is, so that aggregate payments under the prospective payment system, including outlier payments, exceptions, and adjustments, will be neither more nor less than the estimated payment amounts to affected hospitals that would have resulted under the Social Security Act as in effect before April 20,1983.").

[39] Indeed, the FY 1986 IPPS Final Rule included an example where the Secretary recognized an adjustment to the budget neutrality adjustments would be impacted by the removal of nurse anesthetists costs and confirmed that the adjustments to the standardized amounts had already taken this removal into account:

> c. Nonphysician anesthetist costs.  In the August 31, 1984 final rule, we implemented section 2312 of Pub. L. 98-369, which provided that hospital costs for the services of nonphysician anesthetists will be paid in full as a reasonable cost pass-through for cost reporting periods beginning before October 1, 1987.
> We did not directly reduce the FY 1985 Federal rates to exclude the estimated costs of these services, *because any required adjustment would be incorporated in the budget neutrality adjustment factors applied to the national and regional standardized amounts*. (See 49 FR 34794; August 31, 1984). ***Since the FY 1986 standardized amounts are derived from an update of the FY 1985 amounts, which were adjusted for budget neutrality, the rates will automatically include the appropriate adjustment***.  We are not making further adjustments to the Federal rates for this factor for either FY 1986 or FY 1987.

50 Fed. Reg. at 35708 (emphasis added).  *See also* 52 Fed. Reg. 33034, 33064 (Sept. 1, 1987) (stating: "In the September 3, 1985 final rule, we noted that to the extent an adjustment was warranted to reflect the removal of these costs from the prospective payment rates for FY 1985, *it was incorporated in the overall **budget neutrality adjustment*** (50 FR 35708). Therefore, because this adjustment has already been built into the FY 1985 base from which the FY 1986, FY 1987, and proposed FY 1988 rates are derived, we did not propose to make further adjustments to the average standardized amounts for FY 1988.").

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 16

Accordingly, the Board finds that the Providers challenge to the standardized amounts at issue are *inextricably* tied to the budget neutrality adjustments made for FFY 1984 and 1985.[40]

Furthermore, Congress has precluded Board (and judicial) review of the FFY 1984 and 1985 budget neutrality adjustments.  Specifically, 42 U.S.C. § 1395ww(d)(7)(A) precludes administrative and juridical review of the neutrality adjustment at § 1395ww(e)(1):

> (7) There shall be no administrative or judicial review under section 1395oo of this title or otherwise of—
>
> (A) the determination of the requirement, or the proportional amount, of any adjustment effected pursuant to subsection (e)(1) or the determination of the applicable percentage increase under paragraph (12)(A)(ii), . . .[41]

Similarly, the statute governing Board appeals is located at 42 U.S.C. § 1395oo and states in subsection (g)(2):

> The determinations and other decisions described in section 1395ww(d)(7) of this title shall not be reviewed by the Board or by any court pursuant to an action brought under subsection (f) or otherwise.

Since the FFY 1984 and 1985 budget neutrality adjustments are based on an ***external, fixed*** reference point (*i.e.*, no greater and no less than the reference point) and are not reviewable, the

---

[40] The Board notes that the D.C. Circuit's decision in *Saint Francis* is not applicable to the 1984 and 1985 budget neutrality adjustments given the statutory provision precluding administrative and judicial review of those adjustments.  Further, *Saint Francis* did not analyze how the standardized amount is updated annually nor did it make specific legal holdings regarding the standardized amount.

[41] With regard to implementing this statutory provision, 48 Fed. Reg. 39752, 39785 (Sept. 1, 1983) states:
> Section 1886(d)(7) of the Act precludes administrative and judicial review of the following:
>   —A determination of the requirement, or the proportional amount, of any "budget neutrality" adjustment effected under section 1886(e)(1) of the Act; or
>   —The establishment of DRGs, of the methodology for the classification of hospital discharges within DRGs, or of the appropriate weighting factors of DRGs under section 1886(d)(4) of the cost. It was the clear intent of Congress that a hospital would not be permitted to argue that the level of the payment that it receives under the prospective payment system is inadequate to cover its costs. Thus, as discussed above, neither the definition of the different DRGs, their weight in relation to each other, nor the method used to assign discharges to one of the groups is to be reviewable. However, if there is an error in the coding of an individual patient's case, review would be permitted. (See the Report of the Committee on Ways and Means on H.R. 1900, H. Report No. 98-25, (98th Cong., 1st Sess.) 143 (1982).) As noted below, we believe the appropriate review concerning coding errors should be conducted by the entity (i.e., the PSRO/PRO or fiscal intermediary) which made the initial determination.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 17

Board finds that the FFYs 1984 and 1985 budget neutrality adjustments effectively fixed the standardized amounts that point forward for use in the IPPS system.[42]

Indeed, the Secretary's implementation of the fixed FFY 1984 and 1985 budget neutrality adjustments confirms that the Providers' allegation that the standardized rates for ***each FFY at issue*** are somehow understated due to alleged errors in the FFY 1984 base rate is moot.

1. *The Secretary determined that the initial standardized amounts for FFY 1984 were too high and, therefore, reduced the FFY 1984 standardized amounts through the FFY 1984 budget neutrality adjustment as reflected in the **final** FFY 1984 IPPS rates*.

In the interim final rule published on September 1, 1983, the Secretary issued a FFY 1984 budget neutrality adjustment to the FFY 1984 standardized amounts of 0.969:

> Section 1886(e)(1) of the Act requires that the prospective payment system result in aggregate program reimbursement equal to "what would have been payable" under the reasonable cost provisions of prior law; that is, for fiscal years 1984 and 1985, the prospective payment system should be "budget neutral."
>
> Under the Amendments, the prospective payment rates are a blend of a hospital-specific portion and a Federal portion.  Section 1886(e)(1)(A) of the Act requires that aggregate payments for the hospital specific portion should equal the comparable share of estimated reimbursement under prior law.  **Similarly, section 1886(e)(1)(B) of the Act <u>requires</u> that aggregate reimbursement for the Federal portion of the prospective payment rates plus any adjustments and special treatment of certain classes of hospitals should equal the corresponding share of estimated outlays prior to the passage of Pub. L. 98--21**.  Thus, for fiscal year 1984, 75 percent of total projected reimbursement based on the hospital-specific portion should equal 75 percent of total estimated outlays under law as in effect prior to April 20, 1983.  Likewise, total estimated prospective payment system outlays deriving from the 25 percent Federal portion, including adjustments and special payment provisions, should equal 25 percent of projected reimbursement under prior laws.
>
> **The adjustment of the Federal portion was determined as follows**:

---

[42] *See, e.g.,* 48 Fed. Reg. 39752, 39765 (Sept. 1, 1983) (stating "We point out that aside from being technically desirable, the effect of standardizing nonlabor hospital costs in Alaska and Hawaii is to decrease the reduction for budget neutrality stemming from the requirements in section 1886(e)(1)(B) of the Act.").

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 18

- *Step 1*—Estimate total incurred payments for inpatient hospital operating costs for fiscal year 1984 that would have been made on a reasonable cost basis under Medicare prior to Pub. L. 98-21.

- *Step 2*—Multiply total incurred payments by 25 percent, i.e., the Federal portion of total payment amounts for fiscal year 1984.

- *Step 3*—Estimate the Federal portion of total payments that would have been made without adjusting for budget neutrality, but with the adjustment for outlier payments.

- *Step 4*—Add an estimate of total adjustments and payments under special payment provisions to the Federal portion (e.g., outliers, indirect medical education).

- *Step 5*—The difference between the step 2 and step 4 amounts is divided proportionally among the standardized amounts, resulting in the budget neutrality adjusted (standardized) amounts.

**The resulting adjustment factor for the fiscal year 1984 <u>Federal portion</u> is .969**.  Payment amounts of hospitals excluded from the prospective payment system (e.g., psychiatric and children's hospitals) and of hospitals not participating in prospective payment because of their participation in demonstrations and studies were not included in the calculations above.[43]

In the final rule published on January 3, 1984, the Secretary revised the Federal budget neutrality adjustment factor to 0.970 using the same methodology.[44]  Significantly, in the January 1984 final rule, the Secretary suggests that, in calculating the budget neutrality adjustment factor, CMS made no attempt to adjust for transfers under IPPS:

> Regarding additional adjustments recommended by commenters, we made no adjustments to either the adjusted standardized amounts or to the budget neutrality estimates for conditions that could not be quantified on the basis of currently available data, even if there were a likelihood that these conditions might exist under prospective payment. For example, no adjustment was made for the likelihood that admissions would increase more rapidly under prospective payment than under the provisions of Pub. L. 97-248, or for costs that might be disallowed as a result of audit or desk review by the intermediaries. *Likewise, we made no attempt to quantify adjustments **for the***

---

[43] 48 Fed. Reg. 39752, 39840-41 (Sept. 1, 1983) (bold, underline emphases added, and italics emphasis in original).
[44] 49 Fed. Reg. 234, 334 (Jan. 3, 1984).

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 19

> *likelihood of transfers under prospective payment*, emergency room
> services, and disallowed costs which are successfully appealed.[45]

Accordingly, while the Providers did not appeal the budget neutrality adjustment, the above
excerpt suggests that the Providers' concern about the Secretary's alleged mistreatment of
transfers may be misplaced and that the treatment of transfers in the in the context of the budget
neutrality adjustment for FFY 1984 may have more significance.

Finally, the Secretary also declined to increase the base standardized amount to reflect the increased
costs associated with the shift in costs of hospital-based physician services from Part B to Part A, as
suggested in a comment. The Secretary noted that such an increase would simply be offset or
neutralized by a corresponding increase in the budget neutrality adjustment for FFY 1984:

> Finally, applying such an adjustment to the average standardized
> amounts (and, by extension, to the per case budget neutrality
> estimates of Federal rate payments) would not actually increase the
> level of payments under budget neutrality. If we were to increase the
> initial standardized amounts to reflect this shift, the budget neutrality
> adjustment factor would have to be recalculated, would accordingly
> be increased, and the net result would be virtually identical. As a
> result, such an adjustment would have no effect on payment levels
> during FYs 1984 and 1985, which are subject to budget neutrality.[46]

Regardless, the Secretary's application of a 0.970 budget neutrality adjustment factor to the FFY
1984 standardized amounts for the Federal rates confirms that these standardized rates were too
high and were reduced by a factor of 0.030.  Thus, the ***final*** IPPS payment rates as used for the first
year of IPPS (*i.e.*, FFY 1984), as finalized on January 3, 1984, reflect the Secretary's FFY 1984
budget neutrality adjustment.  Moreover, as previously noted, since the FFY 1984 budget neutrality
adjustment is based on an ***external, fixed*** reference point (*i.e.*, no greater and no less than the
reference point) and is not reviewable, the FFY 1984 budget neutrality adjustment effectively ***fixed***
the standardized amounts for FFY 1984 as used from that point forward (*i.e.*, as used both for the
FFY 1984 IPPS payment rates and for subsequent years).

> 2. *The FFY 1985 budget neutrality adjustment also reduced the FFY 1985 standardized*
>    *amounts, reaffirming that the Secretary's determined that the initial standardized*
>    *amounts for FFY 1984 were set too high.*

---

[45] *Id.* at 255 (Emphasis added.)  *See also id.* at 331 (stating as part of the discussion on the budget neutrality
adjustments: "The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) established a DRG-adjusted limit on
the allowable amount of inpatient operating costs per case and a per case limit on the rate of increase of operating costs
of inpatient hospital services. Due to these per case limits, the incentives that influence hospital admission patterns are
similar under TEFRA and prospective payment. Accordingly, ***we have assumed that the number of admissions under
both prior law and the prospective payment system will be the same***. As a result, the budget neutrality factors can be
calculated by comparing reimbursement per discharge for each of the systems, and there is no need to estimate an
actual number of hospital admissions." (emphasis added)).
[46] *Id.* at 255.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 20

For FFY 1985, the Secretary applied a budget neutrality adjustment of 0.954 to the standardized amounts used for the Federal national rates and 0.950 to the standardized amounts used for the regional rates.  The Secretary described these adjustments as follows:

> In accordance with section 1886(e)(1) of the Act, the prospective payment system should result in aggregate program reimbursement equal to "what would have been payable" under the reasonable cost provisions of prior law; that is, for FYs 1984 and 1985, the prospective payment system must be "budget neutral".
>
> During the transition period, the prospective payment rates are a blend of a hospital-specific portion and a Federal portion. ***Further, effective October 1,1984***, *the Federal portion will be a blend of national and regional rates*. As a result, we must determine three budget neutrality adjustments— one each for both the national and regional rates, and one for the hospital-specific portions. The methodology we are using to make these adjustments is explained in detail in section V. of this addendum.
>
> Based on the data available to date, we have computed the following Federal rate budget neutrality adjustment factors:
>
> Regional—.950
> National—.954[47]

****

By finalizing an adjustment factor less than 1, the Secretary confirmed that the standardized amounts were too high.  Thus, like her budget neutrality adjustments made for FFY 1984, the Secretary again confirmed that the standardized amounts were too high and exercised her discretion to reduce the standardized amounts to be used in the ***final*** FFY 1985 IPPS rates.[48]

> 3. <u>The Secretary has applied the FFY 1985 budget neutrality-adjusted rates to FFY 1986 and subsequent years.</u>

For FFY 1986, the Secretary confirmed that she used the FFY 1985 budget neutrality adjusted federal rates as the basis for determining the FFY 1986 federal rates:

---

[47] 49 Fed. Reg. 34728, 34769 (Aug. 31, 1984).

[48] In the preamble to the FFY 1985 Final Rule, the Secretary "noted that most of the data that the budget neutrality adjustment is based on has already been made available [to the public].  We believe that these data in conjunction with the explanation of the budget neutrality methodology presented in the NPRM (49 FR 27458) should enable individuals to replicate the adjustment factors. . . . In addition, <u>we believe the lengthy and detailed description of the data and the development of rates contained in the **Federal Register**, along with the many examples furnished, afford the reader all the information necessary for an understanding of the prospective payment system.</u>  Those individuals, hospitals, or associations desiring additional data and other material, either for verification of rates or for other purposes, may request this date under the Freedom of Information Act."  49 Fed. Reg. at 34771.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 21

> [T]he FY 1985 adjusted average standardized amounts (Federal rates) were required by law to be adjusted to achieve budget neutrality; that is, to ensure that aggregate payments for the operating costs of inpatient hospital services would be ***neither more nor less than*** *we estimated would have been paid under prior legislation for the costs of the same services*. (The technical explanation of how this adjustment was made was published in the August 31, 1984 final rule (49 FR 34791).) ***These budget neutrality-adjusted rates for FY 1985 are then to be used as the basis for the determination of rates for later years***.
>
> Our FY 1985 budget neutrality adjustment factors were based on data and assumptions that resulted in standardized amounts that were higher than necessary to achieve budget neutrality. Therefore, we have updated the FY 1985 standardized amounts using a factor that takes into account the overstatement of the FY 1985 amounts ***to ensure that accuracy of the FY 1986 standardized amounts***. To this end, we have identified several factors, discussed in section III.A.3.c., below, that contributed to the *overstatement* of the FY 1985 standardized amounts. We have determined an appropriate percent value for each of them, and have combined them into a proposed composite ***correction*** factor for FY 1986 that equals —7.5 percent.[49]

Significantly, in the above excerpt, the Secretary further confirmed that "[t]hese budget neutrality-adjusted rates for FY 1985 are then to be used *as the basis for the determination of rates **for later years**.*"[50]  While it is true that the implementation of these rates for FFY 1986 were delayed by Congressional action extending the FFY 1985 rates through April 30, 1986 (as discussed further in **Appendix B**), the Secretary confirmed that it used the rates published in the FFY 1986 IPPS Final Rule plus a 1.0 percent modification specified by Congress:

> Section 9101(a) of Pub. L. 99-272 amends section 5(c) of Pub. L. 99-107 to extend the FY 1985 inpatient hospital prospective payment rates through April 30,1986. Therefore, the DRG classification changes and recalibrated DRG weights that were set

---

[49] 50 Fed. Reg. 35646, 35695 (Sept. 3 1985) (emphasis added).  *See also* 49 Fed. Reg. at 34767 (stating "We believe the explicit language of section 2310 of Pub. L. 98-369 and section 1886(d)(3)(A) of the Act requires a reduction in the standardized amounts used to compute the Federal rates before adjusting for budget neutrality. . .. Thus, while the Federal rates. . .. have been reduced in this final rule to reflect the inflation factor prescribed by section 2310 of Pub. L. 98-369, we point out that the offset for budget neutrality has also been adjusted. The reduction in the regional and national standardized rates . . . attributable to section 2310 of Pub. L. 98-369 is entirely due to the revised budget neutrality adjustments for 1984 and 1985.").

[50] *Id.* (emphasis added).

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 22

> forth in the September 3,1985 final rule (50 FR 35722) are
> effective for discharges occurring on or after May 1, 1986.
>
> ****
>
> In accordance with the provisions of section 9101(b) and (e) of
> Pub. L. 99-272, the adjusted standardized amounts that were
> published in the September 3,1985 final rule (which reflected a
> zero percent update) are updated by one-half of one percent
> effective for discharges on or after May 1,1986. The revised
> standardized amounts are set forth in Table 1, below.[51]

Significantly, *a glaring gap in the Providers' response to the Medicare Contractor's jurisdictional challenge* is their failure discuss or even recognize how the Secretary interpreted and applied the FFY 1985 budget neutrality adjustment.

The Board has set forth in **<u>Appendix C</u>** excerpts from the preambles of other final rules to provide additional contexts in which the Secretary confirmed that the FFY 1985 budget neutrality-adjusted rates applied to later years.  Thus, *regardless of how the Providers contend the Medicare statute should be interpreted relative to the 1985 budget neutrality adjustment*, it is clear that:

1. The Secretary herself interpreted those provisions as requiring the application of the FFY 1985 budget neutrality-adjusted rates to later years; and

2. The FFY 1985 budget neutrality-adjusted rates are the basis for the rates used in FFY 1986 forward through to the years at issue.

Accordingly, the Board finds that the Providers' issue is inextricably tied, at a minimum, to the FFY 1985 budget neutrality adjustments.

* * * * *

In summary, the Providers confirm that they do not seek to challenge the FFY 1984 or 1985 IPPS payments or the associated FFY 1984 and 1985 budget neutrality adjustments, but rather "are challenging an entirely separate factor in the calculation of the DRG Payment Amounts (i.e., the base rate calculation of the standardized amount). . ."[52]  They also claim that the Budget Neutrality Preclusion Provisions are not applicable here because they only bar administrative and judicial review of *a narrow category of challenges* to the Secretary's determination of the requirement, or the proportional amount, of any budget neutrality adjustment effected pursuant to 42 U.S.C. § 1395ww(e)(1) in FFYs 1984 and 1985.[53]

The Board disagrees and finds that it lacks substantive jurisdiction over the issue raised in these appeals because the *prospectively-set* standardized amounts used for IPPS rates for FFYs 1984 and

---

[51] 87 Fed. Reg. 16772, 16773 (May 6, 1986).

[52] Case No. 19-0212G *et al.*, Providers' Response to MAC Jurisdictional Challenge at 21.

[53] *See e.g., id.* at 7.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 23

FFY 1985 are each based on the budget neutrality adjustment made for that FFY and the 1984 and 1985 budget neutrality adjustments are presumably designed to be corrective of the initial base rate that was set *using 1981 data*.[54] Therefore, the *final* FFY 1984 and 1985 standardized amounts are *inextricably intertwined* with those applicable budget neutrality adjustments.[55] Indeed, the Secretary applied a budget neutrality adjustment to those years to reduce the standardized amounts by factors of approximately 0.03 for FFY 1984 and 0.05 for FFY 1985 and, thus, these budget neutrality adjustments appear to have already automatically accounted for any such alleged errors in setting the initial base rate (which again was based on *1981 data*).[56] Because the FFY 1985 budget neutrality-adjusted rate was used/flowed forward for determining FFY 1986 rates and the rates for subsequent FFYs and because 42 U.S.C. 1395ww(d)(7) prohibits administrative or judicial review of the FFY 1984 and 1985 budget neutrality adjustments and the resulting *final* standardized amount for FFY 1985 was carried/flowed forward to FFY 1986 and succeeding FFYs, the Board may not review the standardized amount used for the FFYs being appealed as it relates to the common issue in these appeals.  In this regard, the Board again notes that the rates for

---

[54] The Board has included at **Appendix B** examples of other adjustments to the standardized amounts that have occurred outside of the FFY 1984 and 1985 budget neutrality adjustments.  These intervening adjustments for FFYs 1986 and 2018 include both mandatory and discretionary revisions ***to the standardized amounts*** (as well as the Congress' decisions to revise or not revise the "applicable percentage increases" for FFYs 1986 and forward as provided in 42 U.S.C. § 1395ww(b)(3)(B)(i)) and highlight the complexity of the issue before the Board, particularly where such adjustments were made in a budget neutral manner or were based on factoring in certain other estimated impacts

[55] *See DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 507 (D.C. Cir. 2019) ("We cannot review the Secretary's method of estimation without also reviewing the estimate. And because the two are inextricably intertwined, section 1395ww(r)(3)(A) precludes review of both."); *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1067 (D.C. Cir. 2018) ("As both a textual and a practical matter, the LIP adjustment is inextricably intertwined with the step-two rate, and so the shield that protects the step-two rate from review protects the LIP adjustment as well."); *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 18 (2nd Cir. 2022) ("Thus, we join the D.C. Circuit in 'reject[ing] the argument that 'an "estimate" is not the same thing as the "data" on which it is based.'" *DCH Reg'l Med. Ctr. v. Azar* . . . . We also adopt the D.C. Circuit's holding that "[i]n this statutory scheme, a challenge to the [Secretary's choice of what data to include and exclude] for estimating uncompensated care is ... a challenge to the estimates themselves. The statute draws no distinction between the two." *Id*. at 506. Indeed, the statutory text of section 1395ww(r)(2)(C)(i) explicitly and affirmatively defines the statutory term "estimate[ ]" to encompass "the Secretary['s] determin[ation]" of what data is the "be[st] proxy for the costs of [qualifying] hospitals for treating the uninsured", and, ultimately, of what data to "use" or not "use." 42 U.S.C. § 1395ww(r)(2)(C)(i)." (citations partially omitted)).  Similarly, the Board notes that the Board erred in finding that it had jurisdiction in *Columbia/HCA 1984-1986 PPS Federal Rate/Malpractice Group v. Blue Cross & Blue Shield Ass'n*, PRRB Dec. 2000-D74 (Aug. 18, 2000). In that decision, the Board found that "the issue in this case, whether the federal portion of the PPS rates should be adjusted because it was based on 1981 hospital cost report data which incorporated an invalid 1979 Malpractice Rule, does not fall into either [of the] limitations on Board jurisdiction [at 42 U.S.C. §§ 1395ww(d)(7) or 1395oo(g)(2)]. The Board finds that it can determine whether the existing statute and regulations concerning the establishment of the federal portion of the PPS rate require or permit retroactive adjustments." *Id.* at 16.  The Board further found that "the retroactive adjustment proposed by the Provider would increase the federal portion of the PPS rates ***and therefore require some adjustment to be made to maintain budget neutrality***. 42 U.S.C. § 1395ww(e) and 42 C.F.R. § 412.63(j)" but that "[b]ecause the Board has determined that the adjustments are not required, how those adjustments would be made are moot, and in any event would not be subject to review by the Board. 42 C.F.R. § 405.1804(a)." *Id.* at 18 (Emphasis added.)  While the Board's 2000 decision got it right that the FFY 1984 budget neutrality provision is implicated and precluded from administrative review, the above case law demonstrates that the Board erred in finding it could review the FY 1984 standardized amounts.  Rather, the case law (as well as the Board's discussion herein) demonstrates that any adjustment to the FFY 1984 standardized amounts would be *inextricably* tied to the ensuing budget neutrality adjustments made for FFYs 1984 and 1985.

[56] *See supra* note 39 (discussing how the removal of nurse anesthetists costs were removed from IPPS and how that removal was *automatically* accounted for as part of the 1985 budget neutrality adjustment).

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 24

FFY 1986 and subsequent years are based on the budget neutrality adjusted FFY 1985 rates and the Providers may not simply pass through, or over, the budget neutrality adjustments for FFYs 1984 and 1985, *for purpose of future FFYs*, because those adjustments are tied to an absolute *external* event (the Secretary's estimate, based on the best available data, of what would have been paid for those years if there were no IPPS) ***and*** were ***fixed*** (no greater *and* no less than what would have been paid had there been no IPPS).  To do otherwise, would impact the very integrity of IPPS.

Accordingly, the Board finds that: (1) the appealed issue is *inextricably* intertwined with the FFY 1984 and 1985 budget neutrality adjustments to the standardized amounts *for purposes of future FFYs* under the operation of 42 U.S.C. §§ 1395ww(b)(3)(B), 1395ww(d)(3)(A), and both 1395ww(d)(2)(F) and 1395ww(d)(3)(C) which reference 1395ww(e)(1)(B), as demonstrated by the fact that the FFY 1985 budget-neutrality adjusted rates were used as the basis for the determination of rates for FFY 1986 and later years; and (2) 42 U.S.C. §§ 1395oo(g)(2) and 1395ww(d)(7) (and related implementing regulations[57]) prohibit administrative and judicial review of those budget neutrality adjustments.  Based on these findings, the Board concludes that it does not have substantive jurisdiction over the issue in the one hundred and nineteen (119) CIRP and optional group cases listed in **Appendix A**.  Accordingly, the Board hereby closes these one hundred and nineteen (119) groups cases and removes them from the Board's docket.

Review of this determination may be available under the provisions of 42 U.S.C. § 1395oo(f) and 42 C.F.R. §§ 405.1875 and 405.1877.

<u>Board Members Participating</u>:                    For the Board:

Clayton J. Nix, Esq.                                                        2/29/2024
Robert A. Evarts, Esq.
Kevin D. Smith, CPA
Ratina Kelly, CPA                              X  Clayton J. Nix
                                               _____
                                                  Clayton J. Nix, Esq.
                                                  Chair
                                                  Signed by: PIV


cc:    Danelle Decker, National Government Services, Inc. (J-K)
       Michael Redmond, Novitas Solutions, Inc. (J-L)
       Dana Johnson, Palmetto GBA c/o National Government Services, Inc. (J-M)
       Pamela VanArsdale, National Government Services, Inc. (J-6)
       John Bloom, Noridian Healthcare Solutions (J-F)
       Wilson Leong, FSS
       Jacqueline Vaughn, CMS OAA

---

[57] *See, e.g.*, 42 C.F.R. §§ 405.1804, 405.1840(b)(2).

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 25

# APPENDIX A
## Jurisdictional Challenges and Responses; Cases at Issue

On September 13, 2023, the Medicare Contractor filed a challenge to the following case with Medicare Contractor, National Government Services, Inc. (J-6):

**20-2057GC**    Catholic Health CY 2017 Understated Base Rate CIRP Group

On September 14, 2023, the Medicare Contractor filed a challenge to the following ninety-three (93) cases which all share a common lead Medicare Contractor, National Government Services, Inc. (J-K):

| | |
|---|---|
| **19-0212G** | Morgan, Lewis & Bockius CY 2015 Understated Base Rate Group |
| **19-0237GC** | Catholic Health System CY 2015 NY Understated Base Rate CIRP Group |
| **19-0413G** | Morgan, Lewis & Bockius CY 2014 Understated Base Rate Group |
| **19-0521GC** | Univ of Rochester CY 2014 University of Rochester MC 2014 Understated Base Rate CIRP Group |
| **19-0592GC** | Northwell Health CY 2014 2014 Understated Base Rate CIRP Group |
| **19-0751GC** | Catholic Health System FFY 2019 Understated Base Rate in Final IPPS Rule CIRP Group |
| **19-0776GC** | Kaleida Health FFY 2019 Understated Base Rate in the Final IPPS Rule CIRP Group |
| **19-0777GC** | Univ of Rochester FFY 2019 Understated Base Rate in the Final IPPS Rule CIRP Group |
| **19-0778GC** | Rochester Regional Health FFY 2019 Understated Base Rate in the Final IPPS Rule CIRP Group |
| **19-0822GC** | Montefiore Health FFY 2019 Understated Base Rate in the Final IPPS Rule CIRP Group |
| **19-0827GC** | Catholic Health LI FFY 2019 Understated Base Rate in the Final IPPS Rule CIRP Group |
| **19-0830GC** | Northwell Health FFY 2019 Understated Base Rate in the Final IPPS Rule CIRP Group |
| **19-0834G** | Morgan, Lewis & Bockius FFY 2019 Understated Base Rate in Final IPPS Rule Group |
| **19-1157GC** | One Brooklyn Health Syste FFY 2019 Understated Base Rate in the Final IPPS Rule CIRP Group |
| **19-1243GC** | Catholic Health LI CY 2015 Understated Base Rate CIRP Group |
| **19-1291GC** | One Brooklyn CY 2015 One Brooklyn Health System Understated Base Rate CIRP Group |
| **19-1323GC** | Rochester Regional Health CY 2012, 2015 Understated Base Rate CIRP Group |
| **19-1356GC** | Montefiore Health CY 2013 – 2015 Understated Base Rate CIRP Group |
| **19-1570GC** | Northwell Health CY 2013 Understated Base Rate CIRP Group |
| **19-1571GC** | Northwell Health CY 2015 Understated Base Rate CIRP Group |
| **19-2023G** | Morgan, Lewis & Bockius CY 2009 – 2010 Understate Base Rate Group |
| **19-2068GC** | Univ of Rochester CY 2015 Understated Base Rate CIRP Group |
| **19-2356GC** | Northwell Health CY 2016 Understated Base Rate CIRP Group |
| **20-1007GC** | Univ of Rochester CY 2016 Understated Base Rate CIRP Group |
| **20-1008GC** | Stony Brook Medicine CY 2015 Understated Base Rate CIRP Group |
| **20-1009GC** | Catholic Health FFY 2020 Understated Base Rate in 2020 Final IPPS Rule CIRP Group |
| **20-1010GC** | Rochester Regional Health FFY 2020 Understated Base Rate in the 2020 Final IPPS Rule CIRP Group |
| **20-1024GC** | Montefiore Health FFY 2020 Understated Base Rate in Final IPPS Rule CIRP Group |
| **20-1027GC** | Catholic Health LI FFY 2020 Understated Base Rate in Final Rule CIRP Group |

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 26

| | |
|---|---|
| **20-1028GC** | Univ of Rochester FFY 2020 Understated Base Rate in Final Rule CIRP Group |
| **20-1029GC** | Northwell Health FFY 2020 Understated Base Rate in Final Rule CIRP Group |
| **20-1030GC** | Kaleida Health FFY 2020 Understated Base Rate in the Final Rule CIRP Group |
| **20-1075GC** | One Brooklyn FFY 2020 Understated Base Rate in the Final Rule CIRP Group |
| **20-1135GC** | Albany Medical Center FFY 2020 Understated Base Rate in the Final Rule CIRP Group |
| **20-1157G** | Morgan, Lewis & Bockius FFY 2020 Understated Base Rate in the Final Rule Group |
| **20-1405G** | Morgan, Lewis & Bockius CY 2016 Understated Base Rate Group |
| **20-1407GC** | Upper Allegheny Health Sy CY 2016 Understated Base Rate CIRP Group |
| **20-1409GC** | One Brooklyn CY 2016 Understated Base Rate CIRP Group |
| **20-1427GC** | Catholic Health LI CY 2016 Understated Base Rate CIRP Group |
| **20-1484GC** | Catholic Health CY 2016 Understated Base Rate CIRP Group |
| **20-1489GC** | Rochester Regional Health CY 2016 Understated Base Rate CIRP Group |
| **20-1537GC** | Albany Medical Center CY 2016 Understated Base Rate CIRP Group |
| **20-1755GC** | Montefiore Health CY 2016 Understated Base Rate CIRP Group |
| **20-1933GC** | Catholic Health LI CY 2017 Understated Base Rate CIRP Group |
| **20-1980GC** | Montefiore Health CY 2017 Understated Base Rate CIRP Group |
| **20-2026GC** | Stony Brook Medicine CY 2016 Understated Base Rate CIRP Group |
| **20-2042GC** | Univ of Rochester CY 2017 Understated Base Rate CIRP Group |
| **20-2078G** | Morgan, Lewis & Bockius CY 2017 Understated Base Rate Group |
| **20-2158GC** | Kaleida Health CY 2017 Understated Base Rate CIRP Group |
| **21-0283GC** | Stony Brook Medicine CY 2017 Understated Base Rate CIRP Group |
| **21-0295GC** | Albany Medical Center CY 2017 Understated Base Rate CIRP Group |
| **21-0450GC** | Northwell Health CY 2017 Understated Base Rate CIRP Group |
| **21-0741GC** | Rochester Regional Health CY 2017 Understated Base Rate CIRP Group |
| **21-0742GC** | One Brooklyn CY 2017 Understated Base Rate CIRP Group |
| **21-1039GC** | Northwell Health FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **21-1044GC** | Albany Medical Center FFY 2021 Understated Base Rate in the 2021 Final IPPS Rule CIRP Group |
| **21-1046GC** | Rochester Regional Health FFY 2021 Understated Base Rate in the Final 2021 IPPS Rule CIRP Group |
| **21-1057GC** | Univ of Rochester FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **21-1058GC** | Catholic Health FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **21-1081GC** | Montefiore Health FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **21-1082GC** | One Brooklyn FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **21-1084GC** | Kaleida Health FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **21-1093G** | Morgan, Lewis & Bockius FFY 2021 Understated Base Rate in 2021 Final IPPS Rule Group |
| **21-1096GC** | Catholic Health LI FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **21-1423GC** | Univ of Rochester CY 2018 Understated Base Rate CIRP Group |
| **21-1427GC** | Rochester Regional Health CY 2018 Understated Base Rate CIRP Group |
| **21-1618G** | Morgan, Lewis & Bockius CY 2018 Understated Base Rate Group |
| **21-1629GC** | Kaleida Health CY 2018 Understated Base Rate CIRP Group |
| **21-1645GC** | Catholic Health LI CY 2018 Understated Base Rate CIRP Group |
| **21-1648GC** | Catholic Health CY 2018 Understated Base Rate CIRP Group |

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 27

| | |
|---|---|
| **21-1660GC** | Montefiore Health CY 2018 Understated Base Rate CIRP Group |
| **21-1673GC** | Albany Medical Center CY 2018 Understated Base Rate CIRP Group |
| **22-0137GC** | Northwell Health CY 2018 Understated Base Rate CIRP Group |
| **22-0186GC** | One Brooklyn CY 2018 Understated Base Rate CIRP Group |
| **22-0666GC** | Northwell Health FFY 2022 Understated Base Rate in the 2022 Final IPPS Rule CIRP Group |
| **22-0667GC** | Montefiore Health FFY 2022 Understated Base Rate in the 2022 Final IPPS Rule CIRP Group |
| **22-0668GC** | Albany Medical Center FFY 2022 Understated Base Rate in 2022 Final IPPS Rule CIRP Group |
| **22-0698GC** | Rochester Regional Health FFY 2022 Understated Base Rate in the 2022 Final IPPS Rule CIRP Group |
| **22-0709GC** | Univ of Rochester FFY 2022 Understated Base Rate in the 2022 Final IPPS Rule CIRP Group |
| **22-0717G** | Morgan, Lewis & Bockius FFY 2022 Understated Base Rate in the 2022 Final IPPS Rule Group |
| **22-0743GC** | Kaleida Health FFY 2022 Understated Base Rate in the 2022 Final IPPS Rule CIRP Group |
| **22-1158G** | Morgan, Lewis & Bockius CY 2017 Understated Base Rate Optional Group II Group |
| **22-1359GC** | Univ of Rochester CY 2019 Understated Base Rate CIRP Group |
| **23-0379GC** | Albany Medical Center CY 2019 Understated Base Rate CIRP Group |
| **23-0692GC** | Albany Medical Center FFY 2023 Understated Base Rate CIRP Group |
| **23-0693GC** | Catholic Health LI FFY 2023 Understated Base Rate in 2023 IPPS Final Rule CIRP Group |
| **23-0694GC** | Catholic Health FFY 2023 Understated Base Rate in 2023 IPPS Final Rule CIRP Group |
| **23-0757GC** | Kaleida Health FFY 2023 Understated Base Rate in 2023 IPPS Final Rule CIRP Group |
| **23-0763GC** | Montefiore Health FFY 2023 Understated Base Rate in 2023 Final IPPS Rule CIRP Group |
| **23-0780GC** | Northwell Health FFY 2023 Understated Base Rate in the 2023 IPPS Final Rule CIRP Group |
| **23-0786GC** | Rochester Regional Health FFY 2023 Understated Base Rate in the 2023 IPPS Final Rule CIRP Group |
| **23-0804GC** | Univ of Rochester FFY 2023 Understated Base Rate in the 2023 IPPS Final Rule CIRP Group |
| **23-0805G** | Morgan, Lewis & Bockius FFY 2023 Understate Base Rate in the 2023 IPPS Final Rule Group |

On September 19, 2023, the Medicare Contractor filed a challenge to the following seven (7) cases which all share a common lead Medicare Contractor, Palmetto GBA c/o National Government Services, Inc. (J-M):

| | |
|---|---|
| **19-2246GC** | Duke University CY 2012 Understated Base Rate CIRP Group |
| **20-0114GC** | Duke University CY 2013 Understated Base Rate CIRP Group |
| **20-1026GC** | Duke University FFY 2020 Understated Base Rate in Final Rule CIRP Group |
| **21-1095GC** | Duke University FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **22-0712GC** | Duke University FFY 2022 Understated Base Rate in the 2022 Final IPPS Rule CIRP Group |
| **23-0468GC** | Duke University CY 2015 Understated Base Rate CIRP Group |
| **23-0723GC** | Duke University FFY 2023 Understated Base Rate in the 2023 Final IPPS Rule CIRP Group |

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 28

On September 22, 2023, the Medicare Contractor filed a challenge to the following case with Medicare Contractor, Noridian Healthcare Solutions, LLC (J-F):

| | |
|---|---|
| **22-1061G** | Morgan Lewis & Bockius CYs 2013 & 2016 Understated Base Rate (Optional Group II) Group |

On October 19, 2023, the Medicare Contractor filed a challenge to the following seventeen (17) cases which all share a common lead Medicare Contractor, Novitas Solutions, LLC (J-L):

| | |
|---|---|
| **19-0726GC** | CarePoint Health FFY 2019 Understated Base Rate in Final IPPS Rule CIRP Group |
| **19-0763GC** | Geisinger Health CY 2015 – 2016 Understated Base Rate CIRP Group |
| **19-0816GC** | Geisinger Health FFY 2019 Understated Base Rate in the Final IPPS Rule CIRP Group |
| **19-1292GC** | Geisinger Health CY 2017 Understated Base Rate CIRP Group |
| **19-2279GC** | CarePoint Health CY 2015 Understated Base Rate CIRP Group |
| **20-1025GC** | CarePoint Health FFY 2020 Understated Base Rate in Final IPPS Rule CIRP Group |
| **20-1068GC** | Geisinger Health FFY 2020 Understated Base Rate in Final Rule CIRP Group |
| **20-1893GC** | CarePoint Health CY 2016 Understated Base Rate CIRP Group |
| **20-1958GC** | Geisinger Health CY 2011 Understated Base Rate CIRP Group |
| **21-0703GC** | CarePoint Health CY 2017 Understated Base Rate CIRP Group |
| **21-1045GC** | Geisinger Health FFY 2021 Understated Base Rate in the 2021 Final IPPS Rule CIRP Group |
| **21-1052GC** | CarePoint Health FFY 2021 Understated Base Rate in 2021 Final IPPS Rule CIRP Group |
| **21-1456GC** | Geisinger Health CY 2018 Understated Base Rate CIRP Group |
| **22-0714GC** | Geisinger Health FFY 2022 Understated Base Rate in the 2022 Final IPPS Rule CIRP Group |
| **22-0997GC** | CarePoint Health CY 2018 Understated Base Rate CIRP Group |
| **23-0756GC** | Geisinger Health FFY 2023 Understated Base Rate in 2023 IPPS Final Rule CIRP Group |
| **23-1044GC** | Geisinger Health CY 2019 Understated Base Rate (NPR) CIRP Group |

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 29

# APPENDIX B

The following are examples of other adjustments to the standardized amounts that have occurred outside of the FFY 1984 and 1985 budget neutrality adjustments and the "applicable percentage increases" for FFYs 1986 and forward as provided in 42 U.S.C. § 1395ww(b)(3)(B)(i):

a. "Restandardization of base year costs per case used in [the] calculation of Federal rates" for both the labor and non-labor portions to reflect the survey-based wage index as discussed in the FY 1986 IPP Final Rule.  50 Fed. Reg. 35646, 35692 (Sept. 3, 1985).

b. Recalibration of DRG weights done in a budget neutral manner pursuant to 42 U.S.C. § 1395ww(d)(4)(C) at least every 4 years beginning with 1986.[58]  An example of recalibration can be found in the FY 1986 IPPS Final Rule wherein the Secretary changed its methodology for calculating the DRG relative weights.[59]

c. Budget neutrality adjustments made to the standardized amount designated for urban hospitals and the one designated for rural hospitals when certain urban hospitals were

---

[58] The Secretary confirmed that, beginning in 1991, these adjustments are to be made in a budget neutral manner:

> Section 1886(d)(4)(C)(iii) of the Act requires that beginning with FY 1991, reclassification and recalibration changes be made in a manner that assures that the aggregate payments are neither greater than nor less than the aggregate payments that would have been made without the changes.  Although normalization is intended to achieve this effect, equating the average case weight after recalibration to the average case weight before recalibration does not necessarily achieve budget neutrality with respect to aggregate payments to hospitals because payment to hospitals is affected by factors other than average case weight.  Therefore, as discussed in section II.A.4.b. of the Addendum to this final rule, we are making a budget neutrality adjustment to implement the requirement of section 1886(d)(4)(C)(iii) of the Act.

59 Fed. Reg. 45330, 45348 (Sept. 1, 1994).

[59] 50 Fed. Reg. 35646, 35652 (Sept. 3, 1985).  As part of this recalibration process, the Secretary responded to a comment on the use of transfers in the recalibration process as follows:

> *Comment:* A commenter was concerned that, by including transfer cases in the calculation of the relative weights, we might be inappropriately reducing the relative weights of DRGs in which there are significant proportions of transfer cases.
>
> *Response:* This commenter assumes that the charges for transfer cases are lower than charges for the average case in a DRG. Our data show that this assumption is not correct for many DRGs. To test the effect of including transfers in the calculation of the relative weights, we computed mean charges for each DRG, both with and without the transfer cases. We then conducted statistical tests to determine whether these two means differed significantly at the .05 confidence level (that is, there is only a .05 probability that the observed difference in the means would occur if the two sets of cases came from the same underlying population). The results indicate that transfers have a statistically significant effect on the mean charges of only 16 DRGs.  For 13 of the 16 DRGs, inclusion of transfer cases tends to ___**increase**___ the mean charges.  However, for three DRGs, the mean charges are reduced by the inclusion of the transfer cases.
>
> Since the inclusion of transfer cases raises the mean charges for some DRGs and lowers them for others, and because these effects are limited to such a small number of DRGs, we decided not to revise the method we used to recalibrate the relative weights. During FY 1986, we will be studying the entire issue of transfers and the appropriate payment for these cases. This study may reveal other ways of handling transfer cases in future recalibrations.

*Id.* at 35655-56.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 30

deemed to be urban effective with discharges occurring on or after October 1, 1988. 53 Fed. Reg. 38476, 38499-500, 38539 (Sept. 30, 1988) (implementing OBRA 87, Pub. L. 100-203, § 4005).[60]

d.  Effective for FFY 1995, eliminating the initial two standardized amounts (one for urban hospital and another for rural hospitals)[61] and replacing them with one single standardized amount as specified at 42 C.F.R. § 1395ww(d)(3)(C)(iii).[62]

e.  Budget neutrality provision at 42 U.S.C. § 1395ww(d)(3)(A)(vi) that allows Secretary to adjust standardized amount to eliminate the effect of "changes in coding or classification of discharges that do not reflect real changes in case mix."[63]

f.  The discretion of the Secretary in 42 U.S.C. § 1395ww(d)(3)(I)(i) to "provide by regulation for such other exceptions and adjustments to such payments amounts under this subsection as the Secretary deems appropriate."

---

[60] *See also* 56 Fed. Reg. 43358, 43373 (Aug. 30, 1991) (stating "Consistent with the prospective payment system for operating costs, the September 1, 1987 capital final rule provided for separate standardized amounts for hospitals located in urban and rural areas. Subsequently, the Omnibus Budget Reconciliation Act of 1987 (Pub. L. 100-203) provided for a higher update factor for hospitals located in large urban areas than in other urban areas and thereby established three standardized amounts under the prospective payment system for operating costs. Large urban areas are defined as those metropolitan statistical areas (MSAs) with a population of more than 1 million (or New England County metropolitan statistical areas (NECMAs) with a population of more than 970,000). Beginning with discharges on or after April 1,1988 and continuing to FY 1995, the Congress has also established higher update factors for rural hospitals than for urban hospitals. The differential updates have had the effect of substantially reducing the differential between the rural and other urban standardized amounts. Section 4002(c) of Public Law 101-508 provides for the elimination of the separate standardized amounts for rural and other urban hospitals in FY 1995 by equating the rural standardized amount to the other urban standardized amount. The separate standardized amount for large urban hospitals would continue. Currently, the large urban standardized amount under the prospective payment system for operating costs is 1.6 percent higher than the standardized amount for hospitals located in other urban areas.").

[61] *See* 42 U.S.C. §§ 1395ww(d)(2)(D), 1395ww(d)(3)(A); *supra* note 21.

[62] Omnibus Reconciliation Act of 1990, Pub. L. 101-508, § 4002(c), 104 Stat. 1388, 1388-33 – 1388-35 (1990).

[63] For example, the Secretary included the following discussion in the preamble to the FFY 1986 IPPS Final Rule:

> As stated above, we have already built case-mix increases into the cost-per-case assumptions used in deriving budget neutral prospective payment rates for FY 1984 and FY 1985.
> Now that there is no further requirement for budget neutrality, we agree that real case-mix increases should be explicitly recognized. In fact, to the extent that case mix continues to increase, hospitals realize the benefit of such increase in increased payments for the current year. This is because we do not recoup payments already made, but only adjust the rates to avoid compounding such overpayments in the future. Thus, FY 1986 prospective payment rates were based on FY 1985 rates, corrected to eliminate all increases in case mix through FY 1985 (since FY 1985 was a budget neutral year). However, we now have data that indicate that case mix has increased an additional 2.6 percent. Hospitals have been realizing the benefit of that increase through increased payments. Our update factor will be adjusted so as to not pass through in the FY 1987 rates 2.0 percentage points of the increase in case mix. However, the 0.6 percentage points that we estimate to reflect a real increase in case mix will be added to the update factor for FY 1987.

51 Fed. Reg. 31505-06.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 31

g.  The subsequent amendments that Congress made in 1994[64] and 1997[65] to add subparagraphs (I) and (J) to 42 U.S.C. § 1395ww(d)(5) to recognize and incorporate the concept of transfers into IPPS *in a budget neutral manner*.  The Secretary made adjustments to the standardized amounts in order to implement the permanent incorporation of transfers into IPPS.[66]

To illustrate the complex nature of these issues, the Board points to the Secretary's exercise of her discretion under 42 U.S.C. § 1395ww(d)(3)(I)(i) on making recommendations to Congress on whether to make adjustments to the "applicable percentage increases" or update factor for FFY 1986 as provided in 42 U.S.C. § 1395ww(b)(3)(B)(i).  In the September 1985 Final Rule,[67] the Secretary asserted that the FFY 1985 Federal rates were "overstated" and cited to the GAO's 1985 report entitled "Report to the Congress of the United States:  Use of Unaudited Hospital Cost Data Resulted in Overstatement of Medicare Prospective Payment System Rates" and, pursuant to 42 U.S.C. § 1395ww(e)(4), made a recommendation to Congress that it not provide any increase to FFY 1985 standardized amounts but rather freeze the FFY 1986 amounts at the FFY 1985 levels (*i.e.*, recommended an update factor of 0 percent for FFY 1986).[68]  The following excerpts from that rulemaking describe how the Secretary determined that the FFY 1985 standardized amounts were overstated when reviewing whether to recommend that Congress adjust the update factor for the FFY 1986 standardized amounts:

> Since the standardized amounts for FY 1985 are used as the basis for the determination of rates for later years, the level of the FY 1985 standardized amounts must be corrected for any experience that developed since they were published. *We believe that it is necessary, **each year**, to review the appropriateness of the level of the previous year's prospective payment rates for providing reasonable payment for inpatient hospital services furnished to beneficiaries*. Further, we think this review must include assessment of whether the previous year's prospective payment rates have established adequate incentives for the efficient and effective delivery of needed care.

---

[64] Social Security Act Amendments of 1994, § 109, Pub. L. 103-432, 108 Stat. 4398, 4408 (1994) placed the then-existing language of 42 U.S.C. § 1395ww(d)(5)(I) into clause (i) and added the following clause (ii): "(ii) In making adjustments under clause (i) for transfer cases (as defined by the Secretary) in a fiscal year, the Secretary may make adjustments to each of the average standardized amounts determined under paragraph (3) to assure that the aggregate payments made under this subsection for such fiscal year are not greater than or lesser than those that would have otherwise been made in such fiscal year."
[65] Balanced Budget Act of 1997, Pub. L. 105-33, § 4407, 111 Stat. 251, 401 (1997), further revised 42 U.S.C. § 1395ww(d)(5)(I) and added § 1395ww(d)(5)(J).
[66] *See* 60 Fed. Reg. 45778, 45854 (Sept. 1, 1995) ("[W]e are revising our payment methodology for transfer cases, so that we will pay double the per diem amount for the first day of a transfer case, and the per diem amount for each day after the first, up to the full DRG amount.  For the data that we analyzed, this would result in additional payments for transfer cases of $159 million.  *To implement this change in a budget neutral manner*, we adjusted the standardized amounts by applying a budget neutrality adjustment of 0.997583 in the proposed rule.").
[67] 50 Fed. Reg. 35646, 35704 (Sept. 3, 1985).
[68] U.S. Gov't Accountability Office, GAO/HRD-85-74, Use of Unaudited Hospital Cost Data Resulted in Overstatement of Medicare's Prospective Payment System Rates (1985).

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 32

In addition to this general consideration, *the FY 1985 adjusted average standardized amounts (**Federal rates**) were required by law **to be adjusted to achieve budget neutrality***; that is, to ensure that aggregate payments for the operating costs of inpatient hospital services would be *neither more **nor** less than* we estimated would have been paid under prior legislation for the costs of the same services. (The technical explanation of how this adjustment was made was published in the August 31, 1984 final rule (49 FR 34791).) *These budget neutrality-adjusted rates for FY 1985 are then to be used as the basis for the determination of rates for later years.*

*Our FY 1985 budget neutrality adjustment factors were based on data and assumptions that resulted in standardized amounts that were **higher** than necessary to achieve budget neutrality.* Therefore, *we have updated the FY 1985 standardized amounts using a factor that takes into account the **overstatement** of the FY 1985 amounts to ensure that accuracy of the FY 1986 standardized amounts.* To this end, we have identified several factors, **_discussed in section II.A.3.c._**, below, that contributed to the overstatement of the FY 1985 standardized amounts. *We have determined an appropriate percent value for each of them, and have combined them into **_a proposed composite correction factor_** for FY 1986 that equals –7.5 percent.*

In addition, we have developed factors representing productivity, technological advances, and the elimination of ineffective practice patterns, which are necessary to ensure the cost-effective delivery of care. Each of these factors interacts with the others, to some extent, and has an impact on the quality of care. Making conservative assumptions, we have determined an appropriate percent value for each of these factors, taking into consideration their potential effect on quality. **We have combined these values into a composite policy target adjustment factor**, **as discussed in section III.3.e., below**. For FY 1986, this factor equals —1.5 percent.

The Secretary is required under section 1886(e)(4) of the Act to make those adjustments in establishing the update factor that are ". . . necessary for the efficient and effective delivery of medically appropriate and necessary care of high quality." *Establishing FY 1986 prospective payment rates based on FY 1985 rates **that have been demonstrated to be overstated**, clearly would not comport with the statutory requirement that the rates represent payment for efficiently delivered care.*

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 33

Since the forecasted hospital market basket increase for FY 1986 is +4.27 percent, and the adjustment for Part B costs and FICA taxes is +.31 percent, it is clear that there is a potential justification of a −4.42 percent decrease in the FY 1986 standardized amounts as compared to those for FY 1985 as described below:

|  | Percent |
|---|---|
| Forecasted market basket increase.. | +4.27 |
| Part B costs and FICA taxes............ | +.31 |
| Composite correction factor............. | −7.5 |
| Composite policy target adjustment factor...................................... | −1.5 |

However, for the reasons discussed in section II.A.3.f., below, we have decided that such a decrease is undesirable.  Therefore, we are maintaining the FY 1986 standardized amounts at the same average level as FY 1985, in effect applying a zero percent update factor.[69]

****

(3) *Additional causes for the overstatement of FY 1985 Federal rates.*  In addition to the factors above, which we believe we must correct, **other considerations also contributed significantly to the overstatement of the FY 1985 standardized amounts**.

When we set the standardized amounts for FY 1985, we made assumptions on hospital cost per case increases in order to estimate, for purposes of budget neutrality, the payments that would have been made had prior payment rules continued in effect. These assumed rates of increase in cost per case were 10.9 percent for 1983, 9.8 percent for 1984, and 9.8 percent for 1985. These assumptions were significantly higher than the actuarial estimates. The actuarially estimated rates of increase in cost per case (which ignore any effects of the prospective payment system such as shorter lengths of stay) are 9.8 percent for 1983, 8.1 percent for 1984, and 8.5 percent for 1985. After application of the revised market basket, discussed previously, use of these actuarial estimates would reduce the standardized amounts by an additional 1.2 percent.

---

[69] 50 Fed. Reg. at 35695 (bold, italics, and underline emphasis added).

**For FY 1985, we also used 1981 unaudited, as-submitted cost reports (to get recent data as quickly as possible) to set the Federal rates.** The hospital specific rates were set using later (1982 or 1983) cost reports that were fully audited. The audits adjusted the total cost for these reports downward by $2.2 billion, of which Medicare realized about $900 million in inpatient recoveries. **Since the cost data used to set the Federal rates do not reflect audit recoveries, it is likely that they are overstated by a similar amount**. We do not know precisely what proportion of this amount applies to capital-related costs and other costs that would not affect the Federal rates. However, approximately 90 percent of hospitals" total inpatient costs are operating costs, and if only 40 percent of the $900 million in audit recoveries is related to Federal payments for inpatient operating costs, there would have been, conservatively estimated, at least a one percent overstatement of allowable costs incorporated into the cost data to determine the FY 1985 standardized amounts.

In addition, the General Accounting Office (GAO) recently conducted a study to evaluate the adequacy of the Standardized amounts. In its report to Congress dated July 18, 1985 (GAO/HRD-85-74), **GAO reported findings that the standardized amounts, as originally calculated, are overstated by as much as 4.3 percent because they were based on unaudited cost data and include elements of capital costs.** GAO recommended that the rates be adjusted accordingly.

We believe that these causes for the overstatement of the standardized amounts are related to our own procedures and decisions. Thus, they are unlike both the market basket index, which is a technical measure of input prices, and the increases in case-mix, which would not have been passed through beyond the extent to which they affected the estimates of cost per case.  Further, as discussed below, even without making these corrections, we could justify a negative update factor for FY 1986, although we are not establishing one. **Since we have decided to set FY 1986 standardized amounts at the same level as those for FY 1985, making corrections now to reflect the cost per case assumptions and the audit data would have no practical effect.  Therefore, we have decided <u>at this time not</u> to correct the standardized amounts for these factors.**

We received no comments on this issue.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 35

(4) ***Composite Correction Factor.*** We are adjusting the standardized amounts as follows to take into consideration the overstatement of the prior years, amounts:

|  | Percent |
|---|---|
| Case mix | –6.3 |
| Market basket | –1.2 |
| Composite correction factor | –7.5[70] |

Congress did immediately act on the Secretary's September 3, 1985 recommendation because, shortly thereafter on September 30, 1985, it enacted § 5(a) of the Emergency Extension Act of 1985 ("EEA-85") to maintain existing IPPS payment rates for FFY 1986 at the FFY 1985 Rates (*i.e.*, provide a 0 percent update factor) until November 14, 1985 as specified in EEA-85 § 5(c).[71] Congress subsequently modified this freeze on several different occasions as explained in the interim final rule published on May 6, 1986:

- Pub. L. 99-155, enacted December 14, 1985, extended the [EEA-85] delay through December 14, 1985.

- Pub. L. 99-181, enacted December 13, 1985, extended the [EEA-85] delay through December 18, 1985.

- Pub. L. 99-189, enacted December 18, 1985, extended the [EEA-85] delay through December 19, 1985.

- Pub. L. 99-201 enacted December 23, 1985, extended the [EEA-85] delay through March 14, 1986.[72]

Second, on April 7, 1986, Congress further revised EEA-85 § 5(c) by extending the 0 percent update factor through April 30, 1986 and then specified that, for discharges on or after May 1, 1986, the update factor would be ½ of a percentage point.[73]  As previously discussed above in the decision at Section B.3, in the final rule published on May 6, 1986, the Secretary confirmed that "*the adjusted standardized amounts that were published in the September 3,1985 final rule* (which reflected a zero percent update) are updated by one-half of one percent effective for discharges on or after May 1,1986"[74] and these FFY 1986 adjusted standardized rates are based on the FFY 1985 budget neutrality-adjusted rates.

---

[70] *Id.* at 35703-04 (bold and underline emphasis added).
[71] Pub. L. 99-107, § 5(a), 99 Stat. 479, 479 (1985).  In July 1984, Congress had *already* reduced the 1 percent update factor planned for FFY 1986 to ¼ of a percentage point.  Deficit Reduction Act of 1984, Pub. L. 98-369, § 2310(a), 98 Stat. 494, 1075 (1984).  As part of the Emergency Extension Act of 1985, Congress further reduced the update factor for FFY 1986, presumably in response to the Secretary's recommendation.
[72] 51 Fed. Reg. 16772, 16772 (May 6, 1986).
[73] *See id.* at 16773.  *See also* Medicare and Medicaid Budget Reconciliation Amendments of 1985, Pub. L. 99-272, § 9101(a), 100 Stat. 151, 153 (1986).
[74] 51 Fed. Reg. at 16773.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 36

The examples highlight concerns about how certain future actions and decisions by the Secretary and Congress build upon prior decisions.  Here, the Secretary's recommendation to Congress regard the FFY 1986 update factor were based on its analysis of the FFY 1984 and 1985 standardized amounts that had already been adjusted for budget neutrality.  To the extent the 1984 standardized amounts had been *further* adjusted (*as **now** proposed by the Providers*), it could have potentially impacted the Secretary's recommendation to Congress for the FFY 1986 update factor as well as Congress' subsequent revisions to the updated factor.  Accordingly, this highlights how revisiting and otherwise adjusting the FY 1984 standardized amounts can have ripple effects with the update factor and other adjustments that were made for subsequent years *based on analysis of the prior year(s) and other information*.

COMPLAINT EXHIBIT 1

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 37

# APPENDIX C

In its decision, the Board has noted that the Secretary confirmed in the preamble of the FFY 1986 IPPS Final Rule that the FFY budget neutrality-adjusted rates were used in determining the rates for FFY 1986 and would similarly be part of subsequent FFYs rates.  The following excerpts from the preambles to IPPS final rules provide additional contexts in which the Secretary confirmed that the FFY 1985 budget neutrality-adjusted rates were part of the rate for later FFYs and illustrate how embedded the FFY 1985 budget neutrality-adjusted rates are in the rates used for FFY 1986 and subsequent years.  Thus, *regardless of how the Providers contend the Medicare statute should be interpreted relative to the 1985 budget neutrality adjustment*, it is clear that the Secretary herself interpreted those provisions as requiring the application of the FFY 1985 budget neutrality-adjusted rates to later years; and that the FFY 1985 budget neutrality-adjusted rates are the basis for the rates used in FFY 1986 forward through to the years at issue.

1.  In the preamble to the FFY 1986 IPPS Final Rule, the Secretary recognizes that the FFY 1985 budget neutrality adjustment accounted for the removal of nonphysician anesthetist costs from the base rates and no further adjustments were needed relative to those costs since the FFY 1985 budget neutrality-adjusted rates were used in determining the FY 1986 rates and would similarly be used for the 1987 rates:

> c. *Nonphysician anesthetist costs*.  In the August 31, 1984 final rule, we implemented section 2312 of Pub. L. 98-369, which provided that hospital costs for the services of nonphysician anesthetists will be paid in full as a reasonable cost pass-through for cost reporting periods beginning before October 1, 1987.  We did not directly reduce the FY 1985 Federal rates to exclude the estimated costs of these services, **because any required adjustment would be incorporated in the budget neutrality adjustment factors applied to the national and regional standardized amounts.** (See 49 FR 34794; August 31, 1984). <u>**Since the FY 1986 standardized amounts are derived from an update of the FY 1985 amounts, which were adjusted for budget neutrality, the rates will automatically include the appropriate adjustment**</u>.  We are not making further adjustments to the Federal rates for this factor for either FY 1986 or FY 1987.[75]

---

[75] 50 Fed. Reg. at 35708 (Italics emphasis in original and bold and underline emphasis added).  In this regard, the Board notes that the FFY 1985 IPPS Final Rule explained how the FFY 1985 budget neutrality adjustment accounted for Anesthetists services:

> *Anesthetists' Services*. Under section 2312 of Pub. L. 98-369, the costs to the hospital of the services of nonphysician anesthetists will be reimbursed in full by Medicare on a reasonable cost basis.  In order to ensure that these services will be paid for only once, we must remove their costs from the prospective payment rates.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 38

2.  In the preamble to the FFY 1987 IPPS Final Rule, the Secretary explains how her budget neutrality adjustments for FFYs 1984 and 1985 had "already built case-mix increases into the cost-per case assumptions used in deriving the budget neutral prospective rates for FY 1984 and FY 1985" and confirms that "FY 1986 prospective payment rates were based on FY 1985 rates, corrected to eliminate all increases in case mix through FY 1985 (since FY 1985 was a budget neutral year)":

> *Comment*: Several commenters stated that we did not consider real case mix increases in the 1983 to 1984 period, and that we finally are considering real case mix increases for the first time.
>
> *Response*: FY 1984 and FY 1985 were years subject to the requirements for budget neutrality. As required under section 1886(e)(1) of the Act, payments under the prospective payment system were to be equal to what would have been paid under rate-of-increase and peer group limits on reasonable costs under prior law (section 1886(b) of the Act) as if the prospective payment system had never been implemented.  Under the rate-of-increase limits and peer group limits, as long as a hospital's cost was lower than that hospital's limits, we paid that cost, regardless of whether real case mix increased or decreased, and regardless of the effect of actual case mix on the cost level for that hospital. . . .  Increases in real case mix were built into the cost per case increase assumptions we used to model the rate-of-increase limits. These assumptions took into account estimates of the impact of the rate-of-increase limits and the peer group limits.  **Consequently, we considered increases in real case mix in FYs 1984 and 1985.**  Moreover, even these assumed increases in cost per case proved to be overstated as we received more recent data against which to evaluate our estimates. To have passed through updated prospective payment case-mix increases for FY 1984 and FY 1985 would have been improper because they would increase program payments over the level that would have been paid under the section 1886(b) limits. **As stated above, we have already built case-mix increases into the cost-per-case assumptions used in deriving budget neutral prospective payment rates for FY 1984 and FY 1985.**

---

For cost reporting periods beginning in FY 1985, we have reduced the adjusted standardized amounts to reflect the removal of these costs **by means of the budget neutrality adjustment methodology**. Our method for doing this is explained in section V.D. of this Addendum. We estimate that FY 1985 payments for anesthetists' services will be about $160 million, or 0.5 percent of Medicare operating costs for hospital accounting years beginning in FY 1985.

Notice of Dismissal for Cases 19-0212G, *et al.*
119 Morgan Lewis Standardized Amount Group Cases
Page 39

Now that there is no further requirement for budget neutrality, we agree that real case-mix increases should be explicitly recognized. In fact, to the extent that case mix continues to increase, hospitals realize the benefit of such increase in increased payments for the current year. This is because we do not recoup payments already made, but only adjust the rates to avoid compounding such overpayments in the future. **Thus, FY 1986 prospective payment rates were based on FY 1985 rates, corrected to eliminate all increases in case mix through FY 1985 (since FY 1985 was a budget neutral year).**

3. In the preamble to the FFY 1988 IPPS Final Rule, the Secretary again recognizes the prior FFY 1985 budget neutrality adjustments to the standardized amounts had already taken into account the removal of nonphysician anesthetist costs and the *FFY 1985 budget neutrality-adjusted rates* ***were reflected in the FFY 1986, 1987, and 1988 rates.***

c. *Nonphysician Anesthetist Costs.* Section 1886(d)(5)(E) of the Act provides that hospital costs for the services of nonphysician anesthetists are paid in full as a reasonable cost pass-through. Under section 2312(c) of Pub. L. 98-369, this pass-through was made effective for cost reporting periods beginning on or after October 1,1984, and before October 1,1987. Section 9320(a) of Pub. L. 99-509 extended the period of applicability of this pass-through so that services will continue to be paid under reasonable cost for any cost reporting periods (or parts of cost reporting periods) ending before January 1,1989 and struck subsection (E) effective on that date.

In the September 3, 1985 final rule, we noted that to the extent an adjustment was warranted to reflect the removal of these costs from the prospective payment rates for FY 1985, it was incorporated in the overall **budget neutrality** adjustment (50 FR 35708). Therefore, **because this adjustment has already been built into the FY 1985 base from which the FY 1986, FY 1987, and proposed FY 1988 rates are derived,** we did not propose to make further adjustments to the average standardized amounts for FY 1988.[76]

---

[76] 52 Fed. Reg. 33034, 33064 (Sept. 1, 1987) (emphasis added).